ROANE, Judge.
Upon an attentive review of the testimony in this cause, I must he of opinion, that the intention of the parties was, that there should be a conditional sale of the slave in question. This intention, indeed, must be clearly proved, or necessarily implied from the' attendant circumstances, or the general rule authorising a redemption, will not be departed from. 1 Pow. on Mortg. 165.
As the line of discrimination, between mortgages and these defeasible sales, cannot well be marked out by any general rule, every case as to the true nature of the transaction, and the intention of the parties must, in some measure, be determined on its own circumstances.
Here, it is to be premised, that the value of the slave in question, even as ascertained by the general current of testimony, though there are very different opinions on the subject, does not exceed in any excessive degree, the sum actually advanced by the appellee, John Turner; and, esti *250 mating that value at the highest sum stated by the witnesseg) purchase of the slave, for the sum advanced, could, at most, only be said to constitute a good bargain.
This case, then, may stand on very different grounds from a case where there may be an enormous inequality in value. For, although inequality of value is not, of itself, a sufficient cause to set aside a sale, yet it is a circumstance deservedly entitled to great weight in discovering the intention of the parties, in a doubtful case, as to the true nature of the contract.
A discovery of the contract being sought from the appellees, by the bill of the appellants, their answer as to this subject, is clearly entitled to credit; especially, when not contradicted by the written agreement, (which was probably the act of Chapman only;) and, when 'it is merely explanatory of the transaction, at and before the time that the contract was completed.
The answer of John Turner is express, that having refused repeated applications from Richard Chapman, to lend him money upon interest; Chapman then proposed to sell him the slave Hannah at 30/., redeemable on payment of the money upon a certain day; that, accordingly, the 30/. was paid, and the slave delivered; and, that it was expressly stipulated, if the money was not re-paid, without interest, the right of redemption should cease,' and the right of property become absolute.
If the written agreement referred to in this answer, had even contradicted the statement of the bargain, it might well be doubted, whether being the sole act of Chapman, and such an act too, as an unlettered man might well suppose to correspond with the bargain, the acceptance of it should bind him as evidencing a variation in the contract. For, as on the one hand, no act of a scrivener can turn that which was intended as a mortgage, into an absolute sale, so as to preclude a redemption, so on the other, it must not be permitted to designing men to turn a real, though defeasible sale into a mortgage, without the free consent of the other contracting party.
But, I think the written agreement in itself may, on the contrary, justly be considered, as corresponding with the real contract as stated by John Turner.
It is an universal rule of interpretation, that that construction shall be preferred, which will reconcile and give effect to the whole instrument, without rejecting any part.
*251 That part of the agreement, which after stating a receipt of 301, goes on to say, “ and put a negro in his hands as security,” may well be verified and considered to have effect, by construing the sale defeasible till July Hanover Court, during which time, the negro would only be a security, and afterwards absolute: Whereas, these words of the agreement* and if the money is not paid at or before the next July Hanover Court, the said Turner is to have the said negro for the said 301., cannot have any effect, without decreeing the sale absolute, after that period. In fact, the last words for the said 301, not only shew that there was a sale, but that the particular price was stipulated and adjusted between the parties.
If, indeed, such price had not been fixed expressly, or by strong and necessary implication, although upon failure of redemption at the day the property would have become absolute at law, and thus the terms of the agreement have had effect, yet equity, considering it as a forfeiture, would have relieved upon compensation.
But, when the price is fixed, it not only inevitably evinces that a sale was the intention of the parties, but renounces that judiciary interposition which is now sought.
Much more then shall this construction prevail, where the price agreed on, is not unreasonable, if at all, below the price for which the slave would probably have sold in ready money.
These are some of the most prominent principles and reasons, which induce me to conclude, that the contract was really a defeasible sale, which on the non-performance of the condition remained absolute.
I think, therefore, that the decree ought to be affirmed.
FLEMING, Judge.
The principal point in this cause is, whether the paper was evidence of a conditional sale only ? The cases cited by the plaintiff’s counsel, were all upon mortgages where time is allowed; but, here the sale was absolute, though liable to be defeated by payment of the money. The first part of the agreement, looks at first sight, like an intention that it should be a mere security for the re-payment of the money; but, the latter part explains the meaning, and shews that the parties intended a conditional sale. There is no covenant for redemption or payment of the money; and, if the slave had died in the mean while, Turner must have borne the loss. This was clearly the understanding of the parties. Turner’s an* *252 swer states, that he was applied to for a loan of money, but that he refused to lend it, as his object was to buy property, and, therefore, that a conditional sale took place; which is not contradicted by any evidence. The original bill states, that the money was not paid, and does not alledge any tender. The amended bill attempts to correct this, but it is only supported by the testimony of one witness, whilst the answer, which is responsive, expressly contradicts it, and the general circumstances of the case are in favor of the answer. The value of the slave is uncertain, but it does not affect the question at all, as there is no improper conduct shewn on the part of Turner. To decree a redemption in such a case as this, would teem with mischief, and set aside an infinite number of sales, under which property is enjoyed. As to the argument with respect to usury, there is not the least foundation for it; as the seller had it in his power to re-pay the money, without any interest at all. And, even, that he was not bound to do. I am, therefore, of opinion, that the decree ought to be affirmed.
CARRINGTON, Judged.
The contract was plainly a conditional sale, and not a mortgage. For, no loan was contemplated by the parties, as Turner positively refused to lend, because he wished to invest his money in property. In consequence of which, a complete sale took place, and the money was advanced on account of the purchase; but, at the same time, a power was given the seller to re-purchase the property, by restoring the price (which was not very inadequate) at a given time, without interest, or any covenant that he should re-purchase, or pay back the money. This, therefore, was a right entirely collateral to the sale; and, as it tended to defeat a fair purchase, it ought to have been strictly pursued. But, there was a failure in the seller to do so; and, the money in fact, was not re-paid upon the day. The sale was consequently discharged of the condition altogether, and the right' of the purchaser was no longer liable to be disturbed. '
In this view of the subject, the case bears no resem- • blance to a mortgage, which is always founded on a loan: and, as in that case, the sole object of the security, is merely to compel re-payment of the money, the creditor is compensated by decreeing him his principal and interest. But here, the object on both sides was a sale; and, only a collateral right to re-purchase by a given day, was reserved *253 to the seller, who was under no obligation to do so, but might exercise the right or not, as he pleased. The cases are, therefore, essentially different; and, consequently, the plaintiff had no right to redeem, after the time had elapsed. I am, therefore, of opinion, that the decree is right, and ought to be affirmed.
LYONS, Judge.
I had .some doubts at first, whether a mere security for re-payment was not intended, and, therefore, the contract subject to redemption. But, upon inspecting the instrument, and the other documents in the cause, those doubts are removed; and, I now think, it was a conditional sale and not a mortgage. That is to say, it was a complete sale, subject to a right in the seller to defeat it, and have the property back, on the re-payment of the money by a given day. Or, in other words, it was a perfect sale, with a right in the seller to re-purchase the property on restoring the money by a certain time.
It is extremely clear, that no loan was contemplated by the parties. For, Turner refused to lend the money, because he wished to invest it in property; and,.therefore, purchased with a view of either having property at the day, or money to go to market with, in order to purchase it. For which reason, he did not demand interest, or insist on a covenant for re-payment; circumstances clearly shewing, that no loan was intended.
It was, therefore, a mere collateral right to re-purchase and defeat the sale by a given day. But, as this was not exerted in time, the sale is now altogether discharged of the power, and the seller can assert no right to the property.
But, the doctrine of pledges was insisted on by the appellant’s counsel. It is, however, generally true, that if goods be pawned, without a day of redemption fixed, he, who pawned, has time during his life to redeem; but, his executors cannot. For, it is a condition personal, and being generally pawned extends only to the life of him who pawned it. Ratcliff v. Davis, Yelv. 178.* So, that in the strictest case of a general pawn, the right of redemption would have expired with Chapman himself; and, therefore, the inference drawn from that doctrine, if the doctrine itself has any application to the case, is altogether inadmissible.
*254 Bat, there is no occasion to resort to any reasoning of that kind, as the cause is capable of being determined upon very different principles. For, the sale, as before observed, was every way complete; and only liable to be defeated by the exercise of a collateral right by a given day: which was not done; and, therefore, the seller could derive no benefit from it.
He might, indeed, have contracted to sell the slave for ready money, and out of the product, he might have repaid the price which he had received for the purchase, taken back the slave, and delivered her to the second purchaser, keeping the overplus of the money, if any, to his own use; becáuse, as the first purchaser would have got his money according to contract, it was of- no consequence to him how it wás raised.
But, nothing of all this was done. There was neither nay actual re-payment or offer to re-pay on the day: so, that the power was never exercised, and, therefore, no advantage will result to it from the seller, who does not appear to have obtained a very inadequate price at that time, for the slave: which is a circumstance of some weight, and destroys the force of the argument, that imposition may be practised under pretense of sales of this kind: because, whenever such imposition appears, or, it is shewn that a borrowing and lending was really contemplated, and no sale intended, that alone will turn the transaction into a mortgage.
Upon the whole, I think the plaintiff had no title to redeem, and, that the Chancellor did right in dismissing the bill. The decree, therefore, ought to be affirmed.
PENDLETON, President.
The principle respecting mortgages pawns hypothecations and pignorations of the civil law, are well settled as to the right of redemption. Equity allows that redemption on this ground, that security for the debt being the object, no price for parting with it is contemplated; and as the subject pledged, is usually of more value than- the debt, it would be unjust that the mortgagor should lose his property, from his misfortune of not being able to pay the money at the day; whilst on the other hand, the creditor receiving his debt and interest, has what was his purpose to secure, and no injury is done him. A Court of Equity, therefore, allows redemption on a general principle adopted by that Court, of relieving against all forfeitures where compensation can be made.
*255 And further, if it appear that a mortgage was really intended, the Chancellor will not suffer the usual relief to be evaded, by any restrictive clauses inserted by the act of scriveners. Against the redemption, the act of limitations does not run, (if it does in any case in equity,) but circumstances may bar it, manifesting a waiver of the right, or such a change in the state of things as would render the redemption iniquitous, instead of being equitable.1 But, as ; on the one hand, the Chancellor will not permit a real mortgage to be made irredeemable by the act of a scrivever, so neither on the othei’, will he suffer real, conditional or defeasible sales to be changed into mortgages by the like acts. The real intention of the parties governs him.
In a defeasible purchase, the condition must be strictly performed at the day, or no relief will be granted; because it does not admit of compensation for the risque. If the thing perish the next day, it must be the loss of the purchaser, he having no covenant, or even implied promise for return of the money in that event; and we are taught by a maxim in equity, that in these casual cases, eventual loss or gain must accrue to, or fall on him who runs the risque.
The reason for holding vendors to this strictness in conditional sales, applies with every degree of weight to the case of slaves in' this country. They are a perishable property and may die the next day: if they should not, however, and are males, they may be very profitable, or, if females, they may by their children increase the stock. Now, can it be imagined, that any vendor could be so warped by interest, as to suppose he might lie by until in event the men had earned profits greatly exceeding the principal and interest, or the women borne several children, and then expect to perform the condition when the purchaser had all the mean time risqued their lives ? If there be such a vendor, I am sure he will receive no countenance from a- Court of Equity.
Upon these general principles, let us examine the present contract, and see whether they apply to it as a mortgage or defeasible purchase ? Chapman’s intention was to borrow, and for that purpose he applied in the beginning of May, to John Turner, who said he had no money to lend; and that he meant to lay out his money in a purchase. In this, he persisted during several treaties which they had, until Chapman yielded; and agreed to sell him Hannah fot 30/., provided, that if the money was paid at July
*256 Hanover Court, without interest, she should be returned; and in the mean time he was to have her as security. On these terms the bargain was closed; and upon the 20th of May, Chapman sent Parsons for the money, with Hannah, and the writing ready signed: which - Turner received and paid the money.
If the writing was really what the counsel have laboured to make it, instead of relieving Chapman, as a necessitous man, imposed on by Turner, I would grant relief to Turner as an illiterate man deceived by Chapman in writing the paper. But there is no deceit; for, the writing manifests the contract to have been as Turner states it. The word security, which gives the aspect of a mortgage, is explained by what follows, to be a pledge till July Hanover f'ourti when, if the money was not repaid, he was to ]-,ave the negro for 30/. Have, must mean property or possession. It could not mean the latter; because, in that, there was no change; and, therefore, it must mean that he was to have the property.
This, then, was a defeasible purchase and not a mortgage; which puts an end to the dispute.
We are told, very truly, that usury and speculations are injurious to society, and that John Turner practised both. If it be usury, to lend money for six weeks without interest, then he is justly chargeable on that head. As to his speculations, they are explained by Castlin, to have been that of small articles of provisions from-his neighbors; and carrying them in his cart to. market at Richmond: a kind of dealing beneficial and not injurious to them.
As to imposition in bargain, there is no proof of any such thing; and the Court will scarcely presume it, from the described characters of the men. They will not readily conclude, that the Miller and Waggoner imposed upon the Magistrate.
Decree affirmed with costs. *

[* But, see Cortelyon v. Lansing 2 Caines’ Cas. Err. 200, in which the subject of pledges is exhausted, by Kent, J, p. 20143.]

[* Roberts's admr. v. Coche, exr. 1 Rand. 121; Robertson v. Campbell et al. 2 Call, 421; King v. Newman, 2 Munf. 40; Pennington v. Hanby et al. 4 Munf. 140; Conway v. Alexander, 7 Crunch, 218; Goodman v. Grierson, 2 Ball and Beatty, 274.]