Brockentirouoh, J.
I consider it a matter of very little consequence, in the present case, whether the original contract between the parties, is to be considered as a sale or a mortgage. If it be the former, it ought to be set aside on account of the gross inadequacy of price, accompanied with the extortion practised on a necessitous man, at the moment that the extortioner was about to proceed, as the officer of the law', to sell his property under an execution, on a forthcoming bond, from which there was no escape, for no security was to be taken. If it be a mortgage, then the debtor has unquestionably the right to redeem.
I admit that according to the terms of the assignment of the bond, the contract at first amounted to an absolute sale : but, according to the evidence of Gilmore, it seems tq me that before Nick left the room, the parties converted the sale into a mortgage. Hyde agreed, that if Nick would pay him his money again in a month, lie should have his bond back again, and thereupon a memorandum was written to that effect. Now, if that memorandum had been written on the same piece of paper with the assignment, I think it would be immediately seen to be a simple defeasance. The contract was either not completely closed, or if it was, they agreed, before they parted, to open and change it. Whether Hyde became ashamed of the extravagant imposition which he had practised, and on Nick’s appeal to him relented, or thought that Nick was too poor to raise the money within the time limited, and therefore he was safe, is a matter of no moment. The agreement to give the time, made it, I think, a mortgage. The sheriff agreed to pay off Scott’s' execution, and to insure his safety, took the bond in pledge.
I do not think that the subsequent transaction between the parties (which appears, from the evidence of Gold, to have been on the 11th April 1820) “mended the bargain” between them, as it is proved Hyde designed it should. Hyde seems to have been very anxious to get in the memorandum, which he had previously given. While that paper was in existence, it would speak for itself, and if it could now be produced, would most probably shew clearly, that *342 the original transaction was a mortgage. The obtaining of the possession of that paper by Hyde, and the non-production 0f are stVOng circumstances against him. Every thing should be presumed against him who suppresses a document which would explain the contract. The witness Morris describes the scene which occurred when that paper was surrendered. Nick, who was poor and illiterate, was in company with Hyde, and asked the witness to examine his pocket book for the receipt which Hyde had given him: while the witness was examining the papers, Hyde was looking over his shoulder, and when in passing them over, one was turned up, Hyde exclaimed that was the one; he took possession of it, and again observed to Nick, that that was the one, to which the latter assented; and so quick was this operation, that the witness had no opportunity of examining it. It was pocketed by Hyde, and has not been seen since. The money, which appears to have been ten dollars, was paid, and the new receipt was executed. This new transaction was not a confirmation of the former, but a change of the bargain, and has in it not one ingredient to recommend it to the favorable consideration of a court of equity. It was an act of extortion; it was an advance of ten dollars in cash, for a bond the net .proceeds of which would produce to Hyde about 200 dollars in less than eighteen months from that time. It was so hard a bargain against Nick, that, to my mind, it is clear that his poverty and not his will consented.
I am of opinion, that the decree of the chancellor was correct in principle, but a small error has been made in the sum decreed; for which error the decree, must be reversed with costs, and a decree entered here for the exact sum due.
Carr, J.
The chancellor considered the bond of Flint for 358 dollars transferred by Nick to Hyde, as a pledge, which might be redeemed in a reasonable time, by paying the amount of Scott’s execution against Nick. I think differently. To my mind, it is clearly proved to have been a conditional sale of the bond. The answer responding to *343 the bill, affirms this positively; the assignment on the bond was in terms unconditional: but what seems conclusive of the fact, is the evidence of Gilmore, a witness examined by Nick. He was present at the transaction, and details clearly the circumstances shewing an absolute sale of the bond; but (he adds) “ when Hyde and this deponent were going to leave the place, Nick called out and observed to Hyde, that he had given him too good a bargain; Hyde replied, that if he would repay him the money in a month, he should have the bond back again; whereupon Hyde wrote a memorandum or receipt to that effect; this deponent thinks he witnessed it, and it was given to Nick.” In the course of his evidence he is asked by Hyde, whether the offer that Nick might get the bond by paying the money in a month, did not come voluntarily from him? He answers, “My understanding was, that the bargain was final, but that when Nick complained, you made him that proposition.” This proof, I think, fixes this as a conditional sale of the bond, according to the distinction taken between such sales and mortgages, in our books. Chapman's adm'x v. Turner, 1 Call 280. Robertson v. Campbell, 2 Call 421. Roberts’s adm'r v. Cocke, 1 Rand. 121. King v. Newman, 2 Munf. 40. Pennington v. Hanby, 4 Munf. 140. In Robertson v. Campbell, president Pendleton, delivering the opinion of the court, says,—“ The great desideratum, which the court has made the ground of their decision, is, whether the purpose of the parties was to treat of a purchase, the value of the commodity contemplated, and the price fixed; or whether the object was the loan of money, and a security or pledge for repayment intended ?”
Rut though I consider this a conditional sale, and that the condition not being complied with, the party cannot, after the day, come to equity for redemption, on the ground of a pledge; yet it is a case, in which an officer of the law, armed with an execution, where no security could be taken, and the day of sale come, buys from the debtor his property to satisfy that execution, on terms so grossly inadequate, that, if the case stood upon the purchase alone, I should be in- *344 dined, indeed I should be dear, to correct the procedure, by decreeing .for the plaintiff all beyond the amount of the execution, and the ten dollars. But the circumstance which thwarts me in this, is the after settlement between these parties. The sale of the bond was in July 1819. The money was to be paid in a month to get it back. We have it in proof, that the party made exertions to raise this money, but failed. He tells us in his bill, that it was at this time he discovered the fraudulent designs of Hyde, and that he remonstrated with him, and threatened to sue him. This indicates both a knowledge of the wrong which had been practised on him, and a disposition to apply to the law for redress. It was a lis mota, at least. Eight months after this (11th April 1820) Nick agreed to receive of Hyde, ten dollars in addition to the sum for which he had sold the bond,—actually received it,—gave up the former memorandum,— took a receipt from Hyde for the amount of the execution,— and gave him one, as follows ; “ I have received of C. Hyde the full amount he was to give me for a bond of 358 dollars I sold to said Hyde, on C. Flint, witness my hand and seal.” Now, here is a confirmation under seal, of the first contract; and this when the party was no longer in the power of the sheriff, for the execution was paid off; this too, as far as we can perceive, coolly, deliberately and understandingly done; done, as Gold the witness to the receipt says, after his advice to both parties to compromise their dispute; and done, as we must conclude, both from the nature of the transaction and from Gold’s evidence, with a direct view to a compromise. Can we, without the slightest proof to impeach this transaction, set it aside ? It seems to me, that this would be going too far. And I think this is the language of the cases on this subject. Thus, in Cole v. Gibbons, 3 P. Wms. 289. Martin had £ 500. given him by his uncle’s will, in case he should survive the testator’s wife; after the testator’s death, Martin being extravagant, needy and in debt, sold this legacy (he being then twenty-four years old, and his aunt sixty-four) for £100. to be paid by £ 5-. per annum, but-' that if testator’s wife should die before Martin, in such *345 case the rest of the money to be paid in one year next; Martin survived his aunt, and after her death, with full knowledge of the facts, confirmed the bargain. He after-wards filed a bill to set it aside. It was first heard by lord chancellor King, and afterwards reheard by lord chancellor Talbot. They concurred in decreeing, that by his deliberate confirmation of the bargain, Martin was bound: lord Talbot remarked, that had all depended on the first assignment, he would have set it aside, as being an unreasonable advantage made of a necessitous man; but seeing that Martin was afterwards fully apprised of every thing, had the executor’s answer read to him, and yet chose to execute a deed of confirmation of his former assignment, and since not the least fraud or surprize had appeared on the part of the defendant, it was too much for any court to set all this aside. In a note on the same case, there is a case reported as decided by lord chancellor Cowper. A man was caught in bed with another’s wife, and the husband who caught him, having a sword in his hand, was about to kill him, he being unarmed and in his power; but upon the man’s desiring the husband not to take advantage of him, and saying that he would make him reparation, they went into another room, where the man gave the husband a note for ij 100.: the husband called for payment; the man excused himself for not being ready to pay, but gave his bond for the money, and after filed a bill to be relieved: lord Cowper declared, that if the matter had rested on the note, which was gained by a man armed from one naked, and by duress, he should have made no difficulty of granting relief; but when, after-wards, the plaintiff had coolly, and without any pretence of fear or duress, entered into a bond to the husband, he had thereby himself ascertained the damages, and ought not to be relieved. The great case of Chesterfield v. Jansen, 1 Atk. 301. contains all the doctrine upon this subject, and is a case of the highest authority; and the decree there was in conformity with the cases I have quoted. Upon this view of the case, I cannot but think that the parties, having deli *346 berately settled their dispute, must abide by it; and that the kill ought on this ground to have been dismissed.
Tucker, P.
I am of opinion, that the bill, in this case, is sufficiently broad to entitle the plaintiff to relief on one of two grounds; either that the transaction between the parties, if to be considered as an absolute sale of Flint’s bond to Hyde, was unconscionable and oppressive; or that, if it be considered as a mortgage, Nick was entitled to redeem. In either aspect it appears to me to have been a shameful imposition on the part of Hyde.
Take it to have been, as he now says it was, an absolute sale, and look to the circumstances. First, the time: it was on the day of sale of Nick’s property under an execution on a forthcoming bond, when all further delay was hopeless. Next, the parties: Nick (as it proved) a poor and very ignorant, but honest man; Hyde, a deputy sheriff, astute and vigilant, versed in business, in no small degree conusant of the law of these matters, and skilled in “ mending a bargain” (as he said to one of the witnesses) when he had committed a faux pas. This man holds the execution over Nick, and has him in his power. Then, the circumstances: He took Nick aside, and “after some conversation apart’’ Nick let him have the bond: what passed in this conversation, who knows save the parties ? Nick says, Hyde pretended friendship for him, and Hyde denies it; but he himself acknowledges, in his answer, Nick’s great “ anxiety for the sale of the bond, to prevent a sacrifice of his other property;” and in that state of things he gets from a needy man, who was in his power, a bond for 358 dollars, for 154 dollars. Did the risque of insolvency justify this discount? Not at all. The bond (it seems) was secured upon real property ; and Hyde not satisfied with that, requires and obtains a man of unquestioned solvency to join in and become responsible for the assignment. It would be a waste of labour to cite authorities, and of words to enter upon an argument, to prove, that this was a most unconscionable and oppressive bargain, obtained by an officer of the law from a *347 debtor in his power, and therefore peculiarly the object of jealousy and distrust. Nothing is more- easy than for persons so situated, to affect a pain they do not feel, at the cruel necessity which duty and their own safety impose, of pursuing the strict course of the law, and to seem to the world indulgent and lenient, while they are practising the most fraudulent arts to obtain their ends. Nothing is more easy for them, than to deceive even their victim himself by blandishments, while they are in reality only tightening the cords which bind him, and enclosing him more inextricably in their fatal toils. The law, therefore, closely scrutinizes all such transactions, and avoids them, where there is a taint of fraud. In this case, it is rank and offensive, if we consider the transaction as an absolute sale, such it is now affirmed by Hyde to have been. It were charity to him to consider it to have been originally a mortgage. But he discards this interpretation of his conduct, and insists that he did make an absolute purchase of the bond. He thus, in effect, avows himself guilty of this gross and shameful imposition; but he is defended upon the ground that the bill does not charge 'official misconduct, oppression or extortion, and that therefore the case proved is not the case made by the pleadings.-
I concur in the belief that the transaction, in its origin, was an absolute sale; and I am of opinion, that the bill is broad enough to comprehend the case, as proved by the indisputable facts in the cause, and to justify a rescission of the contract, if the parties themselves had not rescinded it and substituted a contract of mortgage in its stead. To prove this, let us look at the bill. It charges that the execution against the plaintiff came into the hands of Hyde, as deputy sheriff. It alleges his habit of shaving and speculating upon the needy and distressed. It alleges that, on the day when Hyde came to sell his property under the execution, Hyde pretended to be his friend, and promised to give him time if he would place the 358 dollar bond in his hands as a pledge; that he did so, and took a receipt from Hyde, acknowledging that he held it as a pledge, which Hyde afterwards, by another fraud, got from him. It charges, that the bond of 358 *348 dollars was thus by fraudulent devices and pretences got from him, and that the acts of Hyde, in his character as sheriff and as an individual, were oppressive, fraudulent and unjust: and it asks for general relief. It does not, indeed, set forth that the original act was an absolute sale; but this matter is set forth by Hyde himself, and the circumstances intrinsically prove, that if so, it was fraudulent and oppressive, and entitled the plaintiff to relief.
The chancellor, however, considers the case as one of a mortgage. I think he was right. That the incipient act was an absolute purchase, I do not doubt; and if Hyde had once gpt awayfrom the house, it is probable he would have stuck to it. But Nick called him back at once; and told him he had given him too great a bargain; and Hyde then agreed, that if he would pay the money in a given time, he would give up the bond. This part of the affair, the counsel for Hyde looks upon as a resale, upon a condition strictly to be complied with. I cannot consider it so. There are two other views of it, much more natural and more favorable ,to the character of the appellant, if less so to his pecuniary interest. I should consider the contract for an absolute sale, rescinded by the parties, and a contract for a mortgage substituted; or I should regard the whole affair as forming but -one transaction, and that transaction a mortgage of the bond. The witness says, “ when Hyde and the deponent'were going to leave the place, Nick called out, and observed to Hyde, that he had given him too good a bargain; Hyde replied, if he would pay him the money in a month, he should have his bond back again, and wrote a memorandum to that effect.” What was this memorandum, but a defeasance of the act that moment done? It has, indeed, been destroyed by Hyde, but the account of it speaks plainly enough its character, while it is the business of the court to give to it its fair effect. Now, if a transaction can be interpreted with equal fairness in two ways, in one of which the parties will be found to have acted fairly, legally and honestly, while the other involves them in guilt, fraud and oppression, this court cannot hesitate how to choose between them. *349 Accordingly, I am of opinion that the whole transaction must be taken together, and thus be considered as a mortgage, or the first contract for a sale must be deemed to have been rescinded, and a contract for a mortgage substituted therefor. Either of these alternatives is better than to suppose that Hyde intended to hold on to the sale, to protect himself by the principle of Chapman v. Turner, and to insist upon a contract, which is disgraceful to himself, and most oppressive to the appellee.
I have carefully examined the cases which have been cited by my brother Carr, but they have not made the same impression on my mind, which he has received from them. In Cole v. Gibbons, the purchaser Cole gave £ 100. for a contingent legacy of £500. dependent upon the event of Martin the legatee surviving the testator’s wife. Such a purchase, if there was no fraud or surprize, was capable of confirmation, though the court considered it an unreasonable advantage made of a necessitous man. Now, lord King and lord Talbot both relied upon the fact, that there was no fraud in obtaining the first assignment; and, as it was subsequently confirmed with deliberation, after the death of the wife and the determination of the contingency, they were of opinion it should be binding. So in the anonymous case. Though the note for £ 100. was void (when given) for duress, yet as the maker was liable to damages for the criminal conversation with the payee’s wife, there was an ample consideration to sustain the bond which was afterwards given, deliberately and without duress. But in this case, the oppression is monstrous and revolting, and the act of confirmation, as it is called, is more outrageously unreasonable than the original purchase of the bond. For in the purchase, Hyde gave 154 dollars for a bond of 358 dollars; somewhat less than one half: in the compromise, as it is called, he gave ten dollars for 204 dollars; less than one twentieth. It is true Nick was no longer in execution, but he was ignorant and necessitous, and the deputy sheriff took advantage of him and obtained for ten dollars the release of an equity of redemption to the value of 204 dollars. Surely, *350 the cases cited cannot sustain this corrupt and vicious transaction. Though fair compromises must not be broken in upon, yet no agreement of whatever kind is binding, when there is fraud and oppression on one hand, and ignorance and necessity on the other. Upon the whole, I am of opinion that the decree is right in principle, though there is an error of a few dollars more than the appellee was entitled to, in the amount decreed; for which error the decree must be reversed with costs, and a decree entered here for the proper sum.