Brooke, J.
After what has already been said of the details of this case, I shall say very little. It has been often said, that it is frequently very difficult to distinguish a conditional sale from a mortgage j and I add, that conditional sales ought not to be countenanced by a court of equity, as I think they are too frequently the vehicle of extortion. In the case before us, when the treaty for the loan of money was begun through Parham, the property of Green the borrower was under execution, and he might in some sense be said to be the slave of the lender. It is true, that before the loan was consummated, his property had been sold and Moss had become the purchaser; but it does not appear that he was then less embarrassed, and Moss was well apprized of his embarrassment, and appears to have had a great desire to possess the slaves in question, so much so that when he got possession of them against the consent of Green, he determined to keep them, instead of resorting to the proper tribunal for a decision on his contract. The first part of that contract was certainly nothing more than a mortgage; but to bar any right of redemption, the latter part of it, which by itself might be construed a conditional sale, was afterwards inserted—no doubt with the consent of Green; but that is of no consequence in a court of equity, which will not permit that which is a mortgage to be made irredeemable, even with the consent of parties ; its maxim being once a mortgage always a mort *269 gage. I shall not again cite all the cases that have been cited by the bar and bench. The first case in this court is Chapman's adm'x v. Turner, 1 Call 280. and I shall compare it with the case before us. In that case, the slave was delivered to Turner the lender of the money, at the same time that the money was received, and the money was to be repaid without interest; circumstances characteristic of a sale, and not of a mortgage. In the case before us, the slaves were retained by Green as his property, and the money was to be repaid with interest; both of which are circumstances characteristic of a mortgage. I think these cases are totally unlike. The first was decided by this court to be a case of conditional sale; and able judges have been heard to say, that even that case ought to have been differently decided; such is the unwillingness of courts of equity to sustain forfeitures or to limit the right of redemption, when it sees that the first object of the victim was to borrow money, and not to sell property. If the latter was the object in this case, what good reason can be given for Green's retaining the property, and agreeing to pay interest on the money ? If the intention was to sell on condition, (a condition not likely to be performed, if we are to judge by the state of Green's affairs,) why was the slave not delivered, as is usual in the sale of a slave ? why was interest to be paid on the money borrowed P On these grounds, I think the decree of the superior court was correct in deciding that the contract was a mortgage, and not a conditional sale.
Tucker, P.
I should be much concerned at a difference with part of my brethren on this occasion, if it were not that the line of discrimination between mortgages and conditional sales is confessedly indistinct, and that each case must in a great measure depend upon its own particular circumstances. In this case I *270 am very clearly of opinion that the transaction between the parties was a mortgage, and not a conditional sale.
In considering this question, I am of opinion that it ^ unnecessary to recur to the parol testimony for an explanation of the intention. Not that I deny the admissibility of parol testimony to shew that, by the act of the scrivener, that which was intended as a mortgage has been turned into a conditional sale, or that which was designed as a real though defeasible sale has been converted into a mortgage, against the true meaning of the contracting parties. But where there is no pretence that the agreement is not truly drawn, and where, on the contrary, the party insists on the agreement as drawn, and protests against any change of it by parol evidence, I do not admit that the party so insisting can be permitted to resort to such evidence, for the purpose of proving that the transaction was not what upon its face it purports to be. Such is the case here. The defendant in his answer says, that “ he relies on the sealed instrument as disclosing the whole transaction respecting the said sale of the negroes, and is still willing to be bound by it on his part.” Although, therefore, in many cases parol evidence has been freely admitted to prove an absolute sale in form to be a mortgage in fact, and in some has been admitted for the much more questionable purpose of explaining away a mortgage into a conditional sale (Chapman's adm'x v. Turner, 1 Call 280.) yet such evidence cannot be admissible here. The supposed purchaser does not pretend that the true character of the instrument has been perverted by the fraud, mistake or ignorance of the scrivener, but relies upon it as “ disclosing the whole transaction,” and strongly indicates his protest against an attempt to affect its character by an appeal to loose conversations.
How then is the case upon the face of the written document ? It announces that Green, for the consideration of 393 dollars 89 cents to him in hand 'paid by *271 Moss, bargained and sold the slaves to Moss, to hold to him and his heirs forever, upon the condition that if Green repaid the money with interest at Christmas, the conveyance should be void. If the deed had stopped there, it is not perceived that there could be any doubt that it was a mortgage; a construction confirmed by the fact that the slaves were retained in the possession of the mortgagor, and that the money was to be repaid with interest.
The deed, however, proceeds with a further provision, that if Green fails to pay the 393 dollars 89 cents at christmas, he obliges himself, upon Moss’s paying him the further sum of 206 dollars 11 cents, (to make the sum of 600 dollars, the consideration value of the said negroes,) to deliver the negroes to Moss, and make him a complete title for them. Does this clause convert what was before a mortgage into a conditional sale ? I think not. It is well settled that no restraints will be permitted on the equity of redemption, since, if permitted, they would be perpetually extorted from the necessities of the borrower. And hence a court of equity allows validity to no agreement, made at the time of the mortgage, that in case the money be not repaid, and a further sum be advanced, the conveyance shall be absolute. Thus in the case of Willett v. Winnell, 1 Vern. 488. A. mortgaged lands for securing the payment of £ 200. to B. with the usual provision to be void upon payment at the day; and it was agreed that if the .£200. was not duly paid, then B. was to pay A. a further sum of £ 78. in full for the purchase of the premises. The transaction was held to be a mortgage, and the heir of A. was permitted to redeem upon repayment of the two sums of <£200. and £ 78. the last of which had been paid by the creditor to the administrator of A. This case seems to me to be full to the point, and it has never in any subsequent case been questioned, but on the contrary is referred to by the best *272 elementary writers and abridgments, as establishing the principle that no agreement made at the date of the mortgage, for the purchase of the property on failure of payment, shall be held to operate an extinguishment of the equity of redemption. 5 Bac. Abr. 6. 1 Eq. Ca. Abr. 313. pi. 14.
It is objected indeed that here there is no covenant for repayment of the money, and lord Hardwiclce and other judges, it is said, have always considered the want of it as a circumstance of some weight. But all admit that it is not conclusive. This is very strikingly evinced in Lawley v. Hooper, 3 Atk. 278. 280. where lord Hardwiclce himself says: “It is objected that this is not to be considered as a mortgage, because there is no covenant in the deed to repay the money; but that objection is not well founded, for it is not necessary.” See also Conway's ex'ors v. Alexander, 7 Cranch 218. Mellor v. Lees, 2 Atk. 494. Goodman v. Grierson, 2 Ball & Beatty 278. It seems indeed wonderful that a covenant should be considered so important; for without it the mortgagee has full remedy for his debt, even if the mortgaged subject were to be destroyed. For, as was justly said in King v. King, 3 P. Wms. 358. every mortgage, although there be no covenant nor bond to pay the money, implies a loan, and every loan a debt; as in the case of the mortgage of a ship at sea—though she was taken, and thus lost to the parties, the executor of the mortgagor was decreed to pay the debt secured by the mortgage. So as to welsh mortgages, which never contain a covenant for repayment. Howel v. Price, 1 P. Wms. 291. So in Ross v. Norvell, 1 Wash. 14. there was no covenant for repayment. So in Robertson v. Campbell & Wheeler, 2 Call 421. there was no such covenant. So in King v. Newman, 2 Munf. 40. And so indeed must it be, of necessity, in every case of an absolute sale in form, though, as we well know, many of them have, upon evidence of the trust, been converted into mortgages.
*273 In opposition to this very equivocal fact of the want of a covenant for repayment, we have in this case some of the strongest indications of a mortgage. The first of these is, that the debt and interest upon it are both to be repaid; and as a stipulation for repayment without interest has been considered as evidence that money advanced is purchase money, and not a loan, (1 Call 280.) so the converse seems equally true, that the insisting upon interest is evidence of a loan, and not a purchase. Secondly, the slaves were left in the possession of Green the original owner; which, as judge Pendleton remarks in Ross v. Norvell, is contrary 'to the ordinary effect of a sale. On the other hand, it is with equal truth said by the chief justice, that such retention of possession is of the very nature of a mortgage. This fact, therefore, furnishes the • most unequivocal negation of the transaction having been a sale. Considered as a sale, indeed, it would have been void, (for want of delivery of possession,) as to creditors and purchasers. It would be held, as to them, fraudulent per se; but if it be a mortgage, it is valid and unassailable. Now, where one construction of a transaction makes it fraudulent, and another makes it legal, the court should surely incline towards the latter.
It may be remarked, however, that in no view of this transaction is it a sale. At most it is but a contract to sell upon certain events and on certain terms, at a future day; both parties having, I think, the locus pcenitentice. It is to my mind very clear that Moss at least was not bound to take the slaves. The obligation is on the part of Cree» alone. He signs the instrument; Moss does not. The words are his, not Moss’s. They oblige him, if he does not repay the sum advanced, to convey the slaves to Moss upon his paying him 206 dollars 11 cents more. This would not have amounted to an obligation on the part of Moss to take the slaves, even though he had been party to the deed, and had *274 sealed and executed it. For the words would leave an option with him to pay the additional sum or not, at his pleasure. 2 Bac. Abr. Cov’t. A. p. 64. Drummond’s adm’rs v. Richards, 2 Munf. 337. Suffield v. Baskervill, 2 Mod. 36. And certain it is that if the negroes had died, he would not have completed the purchase unless he was obliged. It would be more reasonable to consider this a mortgage, in which the parties would stand on equal terms, than to hold it a conditional sale, in which Green would be absolutely bound if he could not raise the money, and Moss would be bound or not, at his pleasure; for the rule is that both parties should be bound, or neither. If the instrument were not under seal, this would be undoubted. Cooke v. Oxley, 3 Term Rep. 653. Whether it is equally true in the case of a sealed instrument, may perhaps be questionable; but if not, yet there is a gross inequality in the contract, considered as a sale, which should lead us to reject that interpretation of it: for if the slaves-had died, Moss would have insisted on the return of the money as a loan; as they lived, he insists upon the transaction as a purchase. Green, though looked upon as a vendor, is compelled to take the hazards of a mortgagor, without his rights. He is the insurer of the lives of the slaves, though they are the property of Moss if he does not pay the money in the short period of six or eight weeks. In such a construction of the contract I cannot concur.
It is said, indeed, that Moss absolutely refused to lend his money, and would agree to nothing but a purchase. It is very clear that Green’s object, at least, was to borrow. He did not wish to part with the slaves, as appears from the provision for redemption. And as to Moss’s refusing a loan, it is but a common contrivance for extortion and the extinction of the equity of redemption. But in these cases, as in cases of usury, these covers for fraudulent designs are little respected *275 by courts of equity. In Lawley v. Hooper, 3 Atk. 278. the case was thus. Lawley, an indiscreet young man, having an annuity for life of ¿£200. per annum, and having no means of delivering himself from jail except by disposing of the whole or some part of it, sold to one Lavenant, by indenture, ¿£150. per annum for ¿£1050. In the deed there was a proviso, that if Lawley at any time should desire to purchase back the part of the annuity assigned, and would give Lavenant six months notice, and at the expiration of the notice repay the ¿£ 1050. then Lavenant would reassign. This was decided to be a mortgage; lord Hardwicke saying, “I think there is strong foundation to consider this á loan of money, and I really believe in my conscience that ninety-nine in a hundred of these bargains are nothing but loans, turned into this shape to avoid the statutes of usury”—or, I will add, to extinguish a power of redemption. So in this case, though Moss disavowed a willingness to lend, what was the transaction in effect but a loan, if Green had repaid the money, with interest (for which the deed provided) ? or if, the slaves having died, Moss had refused to pay the 206 dollars 11 cents, and sued for the money which he had advanced ?
With these views, and without adverting to the parol evidence, (as the appellant has avowed that the deed discloses the real character of the transaction, and does not seek to impeach it on the ground of fraud, ignorance or mistake,) 1 am very clearly of opinion that the decree is right upon the merits, and that the appellee was entitled to redeem. I have, however, examined the evidence very carefully, and am satisfied that it ought to make no difference in the result. The distinctions between conditional sales and mortgages are so nice, that I am but little inclined to look to the opinions or to the loose language of witnesses to decide the question. In the case before cited, lord Hardwicke observes, “ The *276 proviso uses.the word repurchase; but there is very little difference in reality' between the meaning of the words repurchase and redemption. One of the witnesses uses the word redemption, and I take-the word purchase, used in all the other depositions, to be only a cant word, meaning a sale or a mortgage; and the indorsement shews they were used promiscuously.” Where to common understandings the shades of difference between terms are so slight, it is hazarding too much to trust to the testimony of individuals not versed in such nice discriminations, instead of resting upon the written and unquestioned evidence of the contract of the parties.
There are some other questions of detail, and perhaps some irregularities and errors in the manner in which the court has carried out its principles, which I shall not examine, as the direction to be given to the case by the opinions of my brethren will render it unnecessary.
Decree reversed with costs. And this court proceeding &c. it is further decreed and ordered that the appellant do pay unto the appellee the sum of 2.06 dollars 11 cents, with interest at the rate of six per centum per annum from the 25th of December 1819 till payment.