P. F. Cold, Appellee, v. Joseph F. Beh, Appellant.

**Mortgages:** ABSOLUTE DEED: EVIDENCE. Parol evidence is admissible to show that a deed, absolute on its face, was intended as security for a loan; but the evidence of that fact must be clear and satisfactory. The evidence in this case is held insufficient to show that the conveyance was so intended.

**Same:** CONSTRUCTION. The word "redeem," as used in a contract forming part of a transaction claimed to constitute a mortgage rather than an absolute conveyance, has no definite significance and does not necessarily imply the existence of an indebtedness; and if it appear that there was no debt from which redemption could be made it will be held to mean "repurchase."

**Same:** RIGHT TO REPURCHASE: RESCISSION: NOTICE. In this action plaintiff's land had been sold under mortgage foreclosure and he thereafter conveyed it to defendant, to whom he was indebted, with the intention that he should take title by redemption from the foreclosure in consideration of the amount required to so redeem and the cancellation of plaintiff's debt to him, with an agreement that plaintiff might repurchase at a stated sum within a given time. Held, that plaintiff had no right to repurchase or redeem after the time specified, and that he was not entitled to notice of forfeiture under the statutes.

*Appeal from Shelby District Court.*—Hon. A. B. Thornell, Judge.

Wednesday, July 5, 1911.

SUIT in equity to have an absolute conveyance decreed to be a mortgage and for permission to redeem therefrom. The defendant denied that the conveyance was intended as security, and further pleaded that he gave plaintiff a contract to reconvey which was never complied with, and that said contract has expired by limitation. The trial court granted the relief prayed, and defendant appeals. *Reversed* and *remanded*.

*Byers & Byers,* for appellant.

*Tinley & Mitchell,* for appellee.

DEEMER, J.—On April 30, 1898, plaintiff by quitclaim deed conveyed to defendant two hundred acres of land in Shelby county. On December 22, 1898, he also conveyed to defendant by quitclaim deed another tract of land consisting of about one hundred and sixteen acres in the same county. At the time of 'the making of the first conveyance defendant executed and delivered to plaintiff a paper, which reads as follows:

Harlan, April 30, 1898. This agreement entered into by and between Joseph F. Beh, party of the first part, and P. F. Cold, party of the second part, witnesseth: That the said P. F. Cold, party of the second part, has this day conveyed by quitclaim deed to said Joseph F. Beh, the following described real estate, to wit: Southwest quarter (S. W. ¼) of section eleven (11), and the northwest quarter (N. W. ¼) of the southeast quarter (S. E. ¼) of section fourteen (14), all in township eighty-one (81), range thirty-eight (38), Shelby county, Iowa. The said Beh to redeem said land from the foreclosure sale heretofore made, and said Cold is by this agreement given until March 1, 1899, to redeem said land from said Beh by paying to said Beh the sum of forty-one hundred eighty-eight and three one hundredths ($4,188.03) dollars, with eight (8) percent interest thereon from date, less whatever sums may be realized by said Beh as rent from said land for the year 1898. Jos. F. Beh. P. F. Cold.

And as a part of the transaction leading to the deed of December 22 defendant delivered to plaintiff the following instrument:

Harlan, December 22, 1898. I, Joseph F. Beh, do hereby agree to sell to P. F. Cold the following described real estate, to wit: The south half of the southeast quarter of section 26, also that part of the northwest quarter of the southwest quarter and the northwest quarter of the northeast quarter of the southwest quarter lying north of the right of way of the Iowa & Southwestern Railway Company in section 36, all of said land being in township 81, range 38, containing 116 acres of land more or less, and to deed said land to said Cold or to whoever he may direct, providing he shall pay to me on or before December 22, 1899, the sum of thirty one hundred dollars and taxes for 1897 and '98. This contract to be held by M. K. Campbell and to be delivered to said Cold upon payment of above sums and interest thereon from this date at 8 percent per annum. If said Cold fails to make said payment promptly at the time fixed herein then this contract to be canceled. Signed this 22d day of December, 1898. Jos. F. Beh. P. F. Cold.

Upon the execution of each of the deeds the defendant immediately went into the possession of the lands described, and has held the same ever since, making valuable improvements thereon, and reducing the same to a high state of cultivation. Plaintiff continued to reside near the lands, and, although he knew that defendant was asserting absolute ownership therein, never made any claim thereto until about the time of the commencement of this suit in January of the year 1903. Plaintiff never received anything from the lands after his conveyance to defendant, and, as already stated, never made any claim thereto until about the time he commenced his suit. The case was pending for some time, and on October 9, 1909, plaintiff filed an amendment to his petition. In the amendment thereto plaintiff claimed that each transaction was in fact a mortgage to secure a loan and that equity

should so declare; but that, if held to be a contract of sale, defendant has never forfeited the same by notice as required by law. As hitherto stated, defendant denied that either transaction was a mortgage, and further pleaded that each of plaintiff's deeds was absolute, and that the contracts to reconvey · were conditional sales, options, or privileges granted to plaintiff of which he did not avail himself, and that he is not entitled to any relief. The trial court found that the first conveyance in point of time was a mortgage, and that plaintiff was entitled to redeem therefrom within ninety days from the time a final accounting was had between the parties, and that the second conveyance was absolute with an agreement that plaintiff might repurchase within a given time, which plaintiff did not do, and that, as to the lands conveyed by the second deed, plaintiff was not entitled to any relief. Defendant alone appeals.

The record is such that it presents nothing but the issue as to the character of the first conveyance construed in connection with the agreement hitherto set out, and

1. Mortgages: absolute deed: evidence.

the admissible parol testimony with reference to the nature and character of the transaction. The deed itself is absolute in form, and the agreement executed at the same time provides that defendant Beh was to redeem the lands from a foreclosure sale which had then been made and Cold was given until March 1, 1899, to redeem the lands from Beh by paying a certain named sum, less the rents received by defendant from said lands for the year 1898. To be entitled to a decree, plaintiff must show by clear, satisfactory, and convincing testimony that this transaction of April, 1898, was in fact a loan made by defendant to plaintiff, and that the written instruments, no matter what their form, were really intended as security for this loan. Parol testimony is admissible to establish these facts notwithstanding the character of the written instrument; for equity looks behind all

forms and to the substance of transactions; and, if the instruments are found to have been executed as security for a loan, they will be declared to be mortgages and decree entered accordingly. The general, if not the uniform, rule, is that, before an absolute conveyance will be declared to be a mortgage, there must be a debt from the grantor to the grantee for which the deed was intended as security. The rules applicable to such transactions have nowhere been more clearly pointed out than in *Hughes v. Sheaff,* 19 Iowa, 335, from which we quote the following:

The most casual reading of the many decisions upon the questions involved in the claims above stated will satisfy anyone of the truth of the remark of Chief Justice Robertson in *Edgington v. Harper,* 3 J. J. Marsh, 354, that every case must be determined by a consideration of its own peculiar circumstances; that the intention of the parties is the only true and infallible test, such intention to be collected from the condition or conduct of the parties, as well as from the facts of the written contract. There is much of good reason in the proposition that in all doubtful cases the law will construe the contract to be a mortgage rather than a conditional sale, for this construction is most apt to attain the ends of justice and prevent fraud and oppression. *Skinner v. Miller,* 5 Litt. (Ky.) 86; *Pointdexter v. McCannon,* 16 N. C. 373 (18 Am. Dec. 591); *Conway's Ex'r v. Alexander,* 7 Cranch, 218 (3 L. Ed. 321). And yet a conditional sale or agreement for a repurchase, if clearly and satisfactorily proved although narrowly watched, will be held valid. 1 Powell, Mortg. 138; *Goodman v. Grieson,* 2 Ball & Beatt. 278; *Pennington v. Hanby,* 4 Munf. (Va.) 140; *Bloodford v. Zeily,* 2 Caines' Cas. (N. Y.) 124 (4 Kent, 144); *Davis v. Thomas,* 1 Russ & M. 506. So that finally we have in all these cases to come back to the inquiry whether the transaction is really a security for the repayment of money or an actual sale; for though in the language of the court in *Ross v. Minshell,* 1 Wash. 19, a deed, however absolute upon its face and though the defeasance be by parol, will be deemed a mortgage if really intended to secure a debt. Yet the line of distinction between mortgages and defeasible

sales can not well be marked out by any general rule, and every case must, in a great measure, be determined on its own circumstances, looking at the true nature of the transaction and the intention of the parties. *Chapman, Adm'r, v. Turner,* 1 Call, 280 (1 Am. Dec. 514) ; *Davis v. Stonestreet,* 4 Ind. 101. And hence the court must take into consideration the price, the circumstances, all the antecedent facts, the situation of the parties, and from these determine the true nature of the transaction. These differ, as we know, as the names of the parties differ, and they so influence the determination in each case that it is next to impossible to deduce from them any general, safe, and comprehensive rule. Now, if the relation of creditor and debtor in any given case continues, and the debt still subsists, we can readily see that the relation of the mortgagee and the mortgagor still remains. If, however, the debt is extinguished by a fair agreement, and the grantor has the privilege merely of refunding if he pleases by a given time, and thereby entitles himself to a reconveyance, there is a conditional sale and the equity of redemption does not continue; for a mortgage without a debt or a debtor without a debt can not exist. The contract being fairly made, a court of equity will not relieve the grantor who neglects to perform the condition on which the privilege of repurchasing depended; for, while the policy of the law prohibits the conversion of a real mortgage into a sale, it does not prohibit the making of conditional sales. If it did, then, in the language of Chief Justice Marshall, a court of chancery would become in a considerable degree the guardian of adults as of infants. 7 Cranch, *supra.*

Plaintiff claims, and testified upon the trial, that the land in controversy had already been sold upon foreclosure of a mortgage, and that defendant agreed to advance him the money with which to make redemption and take a deed as security for the amount advanced as well as for a debt which plaintiff was then owing the defendant, and that the deed with the agreement for redemption were executed as security for this advancement and loan. The testimony shows, however, that plaintiff at the time of the making of the quitclaim deed was heavily involved finan-

cially; that the two hundred acres of land in controversy had been sold by the sheriff under a foreclosure decree; and that the last day for redemption was about to expire, when plaintiff went to the defendant to arrange matters. At that time plaintiff was indebted to defendant upon two promissory notes amounting to the sum of $573. This latter indebtedness was secured by a second mortgage on a part of the two hundred acres of land. At the time of the making of the conveyance and the contract for redemption, the two notes held by defendant were canceled and surrendered to plaintiff, and he has since held them. That we may have plaintiff's exact claim before us, we here quote from his testimony the following:.

The foreclosure sale on the land in sections 11 and 14 was about to expire April 30, 1898, and I made an arrangement with Col. Jack to borrow the money from him. Before the land was sold I made an arrangement with Mr. Beh to loan that money of him, first on the two hundred acres. . . . That is Mr. Beh's signature and my signature. The contract was made in duplicate; two copies of it, and each of them signed by myself. I kept one and he kept one. The contract was signed by both of us, and he kept one and delivered one to me on the day that it was executed. At the same time, after this contract was made out, I gave him a quitclaim deed, the record of which has been offered in evidence in this case. The contract and the quitclaim deed were made at the same time as parts of each other. . . . At the time of making this contract, I owed Mr. Beh a little money, some way or other, but I do not remember now whether I had given any mortgage for it or not. Q. Was that included in this $4,188? A. Yes; you see the amount of the foreclosure was not near that much money; that is, the amount named in this contract is considerably in excess of the amount necessary to redeem the two hundred acres of land, and my indebtedness to Mr. Beh was included to make up this amount. Mr. Beh did not deliver or surrender to me the notes that he held against me at the time this contract was executed and quitclaim deed delivered. Mr. Beh redeemed from those sales on the same day that this deed and con-

tract was executed. . . . The contract (Exhibit 2) was given to me at the time it was written out and signed. I think it is about what it ought to be so far as I know. I took the contract away with me that time. The amount fixed in this contract, $4,188.03, was the amount necessary to redeem those two pieces of land in 14 and 11, and another little deal that we had. The other deal was for something that I owed him on papers. I know one was a small note that I owed Mr. Beh. We figured in the costs of foreclosure and a little something besides. I do not remember exactly how much it was. I could not say that the notes marked 'Exhibit 3' were the ones figured in on that deal. I suppose probably they are. I suppose that Mr. Beh turned the notes over on the 30th of April when I gave him a quitclaim deed to the land, and at the same time that he gave me this contract (Exhibit No. 2) and these notes. I signed no other obligation or any other kind of paper to Mr. Beh except this Exhibit 2 and the cancellation of the Anderson contract. . . . After Mr. Beh made the loan in March or April, 1898, he took possession of the land. Up until four or five years ago I lived at Irwin, and owned land up there in Greeley township. The improvements on this 160 acres of land were moved off after it was turned over and I didn't pay any taxes on the land after Mr. Beh took possession.

Defendant's testimony with reference to the same matter is as follows:

I have known Fred Cold for probably twenty years and have had numerous business transactions with him. In April, 1898, I had some obligations of Mr. Cold's. There were two notes amounting to $573 and some cents. They were secured by mortgage upon real estate. These notes were paid by a deed to this land and other land and these two notes were involved in the transaction of April 30, 1898. Mr. Cold came to me that day, and said there was a foreclosure on this S. W. ¼ of 11, and that there was a certificate of the sheriff on the forty acres, and that he was about to lose the land, and, if I could cancel the mortgage and take a deed that he would give me a deed to this 200 acres of land, the S. W. ¼ of 11 and the N. W. ¼ of the S. E. ¼ of 14; that is, if I would cancel

the debt secured by the mortgage and accept that land in payment of my debt, he would make the deed. And, besides, he wanted me to give him the privilege to reclaim or rebuy, to resell this land to him by a certain date, the 1st of March, 1899, I think. . . . The making of a loan by me to Mr. Cold was never mentioned by either of us. I did not make him any loan. At that time I was trying to get the note settled. When I took the mortgage to secure those notes, I did not know that the first mortgage had been foreclosed on the land or proceedings commenced. There was nothing said to me by Mr. Cold about borrowing the money to redeem this land. He wanted to sell me the land. He offered to sell me the two hundred acres of land by canceling his debt and by giving an extension of time. He was negotiating with different parties in relation to all of the land and wanted this included, and I gave him this contract to extend it to the 1st of March, that I would redeem him this land. The contract I have here is just what we finally agreed on. . . . It was not my intention in either of these transactions to loan the money that is stated in either of these contracts to Mr. Cold and accept his quitclaim deed as security for the loan. The loan feature was never talked of, and I had no intention of loaning money on that land in either of the transactions. I had made no loan to anybody on real estate, and I could not make any to Mr. Cold. If I did anything, I would buy the land. I was not at that time in the business of loaning money on real estate. I found out after I had taken that mortgage that there were quite a few foreclosures, and that I was about to lose this $573.36 loan. If I had not had those obligations against Mr. Cold, I would not have dealt with this land at all. I never at any time loaned Mr. Cold any money on real estate. This $573 was partly on account and some smaller notes, and some were notes that I had taken from other people. At the time that Mr. Cold came to me to have me take this land in settlement of my obligations against him, he told me that he had prospects of getting enough money to reclaim all his land, and he wanted this contract, or wanted me to enter into a contract to resell him this land if he got that loan. . . . At the time the first quitclaim deed was made to me, all of

the obligations that I held against Mr. Cold were canceled and turned over to him, and at the time of the second transaction, and when the second quitclaim deed was given on December 22, the obligations that I held against him were all canceled and turned back to him, so that on December 22, when he gave me the quitclaim deed, it paid all of his obligations to me at that time. . . . When Mr. Cold came to me on this first contract and wanted to sell me this land, we got together on what there was against it, and the taxes and my indebtedness and interest and the price was fixed at $4,188 and some cents. We figured how much that would be per acre. I do not remember, but it was some over $20. His proposal was to wipe out my debt and to wipe out the foreclosure on those two pieces. He was trying to pay his indebtedness. The first contract was dictated by Mr. Byers in his office, and so was the second one. At the time of making this contract, it was understood that the money that I advanced would wipe out and redeem this land from all of these prior sales, and all of these sales were redeemed by me acting under the terms of this contract. I simply went in and made redemption as owner. At the time of this contract on April 30, 1898, I knew that Cold's land was being sold, and that a large part of it had been sold under mortgage foreclosure and Cold told me that he wanted to get it fixed so he could get this indebtedness extended. . . . My memory is that I hesitated to take the land in at $4,188.03 on April 30, as it was more than the land was worth at that time. I told Mr. Cold that it was more than it was worth, and we differed on that more than anything else.

This is all the direct testimony with reference to the transaction now in controversy and practically the only other evidence in the case relates to the value of the land at the time the quitclaim deed was made. This testimony to our minds shows that the land was not at that time worth to exceed $25 per acre or $5,000. Defendant took it at the sum of $4,188.03. If he accepted the land as security for a loan, his margin was very small, and about all he could hope to get out of such a transaction would

be the payment of a doubtful debt of $573. True, he was to have the rents for the year 1898 and the possession of the land; but, if the transaction was a mortgage, he would not be entitled to the rents and profits, but would, save for the contract, be compelled to account for the same to the plaintiff. This, then, is the substance of the case.

Plaintiff relies largely upon the contract between the parties executed as a part of the transaction which uses the word "redeem" in at least two places in referring to

2. SAME: con- the rights of the respective parties. The struction. word has no definite significance. It means to repurchase or to regain, and does not necessarily imply the existence of a valid existing indebtedness. It may, of course, have reference to an existing debt and to the right of a party to redeem from such debt, but this is not necessarily so. If it be shown that there was no debt from which redemption might be made and that the debt has in fact been extinguished, then the word will be construed as repurchase. *Baird v. Reininghaus,* 87 Iowa, 167. As said in *Bigler v. Jack,* 114 Iowa, 667: "Whether any particular transaction does thus amount to a mortgage or to a sale with a contract of repurchase must to a large extent depend upon its own circumstances; for the question finally turns in all cases upon the real intention of the parties, as shown upon the face of the writings, or as disclosed by extrinsic evidence." .

Taking the whole record, we are constrained to hold that the parties used the word "redeem" in the sense of repurchase; that plaintiff has failed to establish by tes-

3. SAME: right timony of sufficient weight that the transac-
to repurchase: tion was intended as security for a loan;
rescission: no-
tice, that he has failed to show that there was any loan; that defendant could not at any time have had judgment against plaintiff on the theory that he, plaintiff, was a debtor after the transaction in April. The evident thought of the parties was that the defendant should take

the title by redeeming the land from the foreclosure sales in consideration of the amount necessary to redeem and the cancellation of plaintiff's indebtedness to him, and that at plaintiff's option he might repurchase (redeem) the land at any time before March 1, 1899, by paying the amount named in the contract which was the purchase price of the land.

If this be the true version of the matter, then, under the authorities, plaintiff had no right to redeem or repurchase after the time fixed, and he was not entitled to notice of forfeiture under section 4299 of the Code. As sustaining these views, see *Hopwood v. McCausland,* 120 Iowa, 218; *In re Shields,* 134 Iowa, 559; *Schoonover v. Petcina,* 126 Iowa, 261; *Cody v. Wiltse,* 130 Iowa, 139; *Tarkington v. Corley,* 59 Iowa, 29; *Russell v. Finn,* 110 Iowa, 301. For authorities sustaining our view as to the construction of the contract using the word "redeem," see *Robinson v. Cropsey,* 2 Edw. Ch. (N. Y.) 138; *Pace v. Bartles,* 47 N. J. Eq. 170 (20 Atl. 352).

The trial court was in error in finding that the transaction of April 30, 1898, was a mortgage, and the decree in this respect must be reversed. The case will be remanded for a decree in harmony with this opinion. *Reversed* and *remanded.*