WILLIAM J. FORT, Appellee, v. MARY E. COLBY, CHARLES HAY-DEN COLBY and C. H. COLBY, Appellants; and JOHN B. DANNER, EDWARD O. EVANS, ABBIE L. EVANS, WALTER CANADY, MARY A. CRAVENS, ALBERT K. KLINGBEIL, GEORGE B. DANNER and MARTIN L. MICKLEY, Appellees.

**Mortgages:** ABSOLUTE DEED: BURDEN OF PROOF: REDEMPTION. An absolute deed may be shown to be in fact a mortgage, but the burden is upon the party so asserting to establish the fact by a fair preponderance of the evidence. When once shown to be a mortgage in its origin it will remain so and the mortgagor's right of redemption cannot be cut off except by foreclosure.

**Same.** Where an absolute deed is accompanied by a contract to reconvey on specified conditions, the terms of which render it uncertain whether the instrument is intended as a mortgage or a conditional sale, it will be held to be a mortgage.

**Same:** EVIDENCE. Plaintiff conveyed the property to defendant by absolute deed, at the same time taking a lease of the land from the grantee and an exclusive option to repurchase. Evidence held to show that the parties did not contemplate an absolute purchase and sale, but that the deed was given as security for a loan, was in fact a mortgage and that plaintiff might redeem therefrom.

**Same:** REDEMPTION. A contract to reconvey to the grantor, executed in conjunction with an absolute deed from him may be valid, but the courts will scrutinize any such transaction closely, and if found to be a method for securing payment of a debt the transaction will be held to constitute a mortgage; as a court of equity will look beyond the mere form to the intent and relation of the parties and will protect the debtor's right of redemption.

**Same.** Where an absolute deed was given as a mortgage the parties cannot by any collateral agreement deprive it of its character as such and defeat the debtor's right of redemption.

**Same.** The agreement of a grantee in an absolute deed to pay only such sums as were required to discharge liens upon the property is a circumstance tending strongly to show that the transaction was considered by the parties to be a mortgage.

**Same:** INADEQUACY OF CONSIDERATION. Mere inadequacy of consideration is not conclusive that a deed absolute on its face was intended as a mortgage, but is a material fact to be considered with other circumstances tending to support that conclusion; especially where there is a substantial difference between the expressed consideration and the value of the property conveyed.

**Same:** RELEASE OF MORTGAGOR'S EQUITY. Where an absolute deed is shown to have been given as a mortgage, a surrender of the mortgagor's equity to the mortgagee will only be sustained upon clear and

satisfactory proof that the agreement to do so was perfectly fair and free from any element of advantage or oppression.

Same: BURDEN OF PROOF: CONSIDERATION. Where a mortgagee obtains a release of the mortgagor's equity in the property, he not only has the burden of showing that it was fair, voluntary, intelligent and unconnected with the original contract of mortgage, but he must also show that it was for an adequate consideration.

Same. Plaintiff gave defendant an absolute deed as security for a loan, and as part of the transaction took a lease of the premises with an exclusive right of repurchase. The defendant served notice of forfeiture and a new lease was made which, after notice of forfeiture, was surrendered and cancelled. The plaintiff had a substantial equity in the property after deducting his indebtedness to defendant, which he thus surrendered without adequate consideration. *Held*, that his right of redemption was not thus cut off.

Same: EQUITABLE RELIEF. Equity will relieve a distressed debtor forced to accept unjust conditions placed upon him by creditors who have his entire estate in their control.

Same: ACCOUNTING: REDEMPTION: ESTOPPEL. Where an absolute deed and a lease of the premises to the grantor constituted only a mortgage, and the equity of redemption had not been legally extinguished, the relation of debtor and creditor still existed, the extent of the mortgagee's right being to demand and receive the full amount of his debt; and a delay of three years did not estop the mortgagor from demanding an accounting and an enforcement of his right to redeem, the mortgagee having previously taken possession of the premises.

Same: MORTGAGEE IN POSSESSION: IMPROVEMENTS: ACCOUNTING. While ordinarily a mortgagee in possession may not burden the premises with improvements at the expense of the mortgagor; still where the contract of the parties contemplated such improvements, and provided that upon a repurchase or redemption by the mortgagor the same should be paid for, the mortgagor was properly charged therewith in an accounting between the parties.

Appeal: TIME FOR TAKING APPEAL. The time for taking an appeal dates from the entry of final judgment and not from an announcement of the court's findings.

*Appeal from Wright District Court.—HON. C. G. LEE, Judge.*

SATURDAY, DECEMBER 13, 1913.

ACTION in equity to declare the conveyance of certain lands to be a mortgage, and to permit plaintiff to redeem therefrom. It is also prayed that defendants be required to account for rents and profits of said lands. There was a trial to the court, and decree for the plaintiff, permitting him to redeem, and finding defendants chargeable with certain rents and profits. From the granting of this relief, the defendants Colby have appealed. In settling the account for rents and profits, the court allowed the defendants credit for certain permanent improvements made by them on the lands, and, from this part of the decision, the plaintiff appeals. The appeal by the Colbys having been first perfected, they alone will be termed appellants. The material facts as shown or claimed by the respective parties are stated in the opinon.—*Affirmed.*

*Herrick & Herrick* and *Guernsey, Parker & Miller,* for appellants.

*Nagle & Nagle* and *Fort & Fort,* for appellees.

WEAVER, C. J.—The business transactions between the parties began in June, 1901. Prior to that time they had no personal acquaintance. Plaintiff was then the owner of 4,449 acres of land, of which 340 acres were situated in Illinois, and the remainder in the counties of Marshall, Wright, and Dickinson, in Iowa. He had become involved in great financial difficulties. His lands were heavily incumbered by mortgage. One or more of the mortgages had been foreclosed; but the time of redemption had not yet expired. There were also judgment liens to be cared for and other outstanding indebtedness. His personal property was mortgaged, and his only apparent hope of relief was in finding some person or persons to whom he could sell or pledge the property mentioned or some of it on terms which would enable him to save the mar-

gin of value therein after paying or otherwise providing for his indebtedness. The aggregate amount of liens upon the lands was then about $155,000. At this juncture negotiations by correspondence and personal interview were opened between plaintiff and C. H. Colby, acting as agent and business manager for his mother, Mary E. Colby. Resulting therefrom, the plaintiff on December 3, 1901, conveyed all said lands by warranty deeds to Mary E. Colby. On the same day, and apparently as part of the same transaction, Colby executed and delivered to plaintiff a writing in the form of a lease of all said lands for five years, with an exclusive option to plaintiff to purchase the same at prices scheduled therein. More particular reference to this contract and the subsequent dealings and correspondence between the parties will be made in the further progress of this opinion.

This suit was begun September 9, 1907. Stated as briefly as practicable, the plaintiff claims and alleges that the Colbys undertook or agreed to lend or advance to him the money necessary to meet his obligations to the extent of $155,000, and that the deeds made by him to Mary E. Colby and the contract or lease executed by her to him were intended by both parties thereto solely as a mortgage or security for the repayment of said loan. He further alleges that at the time of said transaction he was laboring under great mental distress, rendering him unfit for the transaction of business of such magnitude, and the Colbys took advantage of his condition and necessities with the wrongful intent to obtain conveyance of the title to the lands, and eventually to deprive him thereof; that in pursuance of such purpose C. H. Colby sought him out, and solicited the opportunity to make the loan, and finally orally agreed to lend to plaintiff $155,000 for a term of five years at an agreed rate of interest, and that at the request of said Colby plaintiff accompanied him to the office of Colby's attorney, who prepared the papers for execution. He further says that Colby refused to accept security in the usual form, and insisted upon plaintiff's making deeds

of conveyance absolute in form to secure the loan, claiming this was the better and more effective way, and plaintiff, believing in the good faith of such proposal and assurance, consented to the terms so imposed upon him. He further says that he himself was without independent counsel or advice, and was misled by the representations of Colby into signing said instruments without comprehending their full import and effect. Referring to later contracts and agreements of which we shall soon make mention, plaintiff makes substantially the same allegations of having been imposed upon and overreached by the statements and promises of the Colbys, and further avers that in July, 1903, and again in April, 1904, the Colbys served him with notice of forfeiture of the contract theretofore made between them. Soon thereafter, he alleges, said appellants insisted that he had lost all rights in the premises, and thereby under stress of his necessitous condition obtained his signature to a so-called relinquishment of his claims. Similar declarations are made as to all of the several writings which he alleges the Colbys obtained from him under the duress of his necessities, and he alleges that each and all of them were but successive steps in the accomplishment of the original scheme to defraud him. He further alleges that the amount of the agreed loan for the payment of his debts was not more than one-half of the value of the lands conveyed; that said defendants retained the whole amount of $155,000 in their own hands, paying nothing whatever to him, but agreeing to use and apply it to removal of the liens on his lands, but in violation of said agreement, instead of removing the judgment liens, and redeeming from the sheriff's sales, they took sheriff's deeds thereon to themselves. It is further alleged that the said Mary E. Colby has conveyed much the larger part of said lands to third persons, and that the value of the lands thus conveyed and the rents and profits derived from the lands in controversy are greatly in excess of the amount due from the plaintiff on said loan, and he asks that defendants make due accounting, and that he have decree

establishing and confirming his title in the lands which have not been conveyed to third persons, and personal judgment against the Colbys for any balance which may be found in his favor on such accounting.

The Colbys deny all allegations of wrong and fraud, and plead that the deeds were made by the plaintiff and received by the grantee in good faith as absolute conveyances, and not as security. They further aver that the deeds made on December 3, 1901, were made in pursuance of a prior written contract, by which plaintiff undertook to convey to Mary E. Colby all said lands by warranty deed at the agreed purchase price of $155,000, which has been paid in full by said grantee in manner provided for in said agreement. It is further alleged that after the making of the conveyances and contract of December 3, 1901, plaintiff, in various instruments in writing, confirmed said deeds as absolute conveyances, and that, by taking leases of said lands from said grantee, and otherwise acknowledging her as the owner of said lands, he has estopped himself from now denying the same.

Trial was had to the court, resulting in a decree for plaintiff, declaring the conveyances to have been made as security only, and requiring the Colbys to account for rents and profits received. The conveyances made by Mary E. Colby to third persons were permitted to stand; but she was required to account for the moneys so realized. In the accounting defendants were given credit for moneys expended in paying off liens on the lands and in making permanent improvements on some of them. Taking all items into consideration, and treating the advancements made by Mrs. Colby as a loan, the court found that she had been fully repaid the amount thereof, with interest, leaving in her hands a remainder or surplus of $4,505.60 due the plaintiff, for which sum he was given judgment. It was further decreed that said Mary E. Colby reconvey the remaining unsold lands to plaintiff.

I. Considering first the defendants' appeal, the first fundamental inquiry is, of course, the actual nature of the trans-

action which culminated in the conveyances made under date

of December 3, 1901. Were said deeds in-

**1. MORTGAGES: absolute deed: burden of proof: redemption.** tended to be what they appear upon their face—absolute and unconditional conveyances

of title—or were they made and delivered as security for the repayment of a loan?

That such an issue presents one of those exceptional cases in which a party is not precluded from denying the usual force and effect of a writing executed by him, and may prove, if he can, a prior or contemporaneous agreement and understanding, by which a deed absolute in form was given and received as a mortgage only, is, of course, too well settled to require discussion. 3 Pom. Eq. (3d Ed.) Sec. 1196.

The primary question we have to consider is whether such agreement or understanding in this case has been established by the evidence. The burden is, of course, upon the party asserting such agreement to establish it, not necessarily beyond a reasonable doubt, but by a fair and clear preponderance of evidence, for, in the absence of showing to the contrary, the presumption is that every writing is what it purports upon its face to be. On the other hand, the intent of the parties to make an absolute conveyance serve the purpose of security for debt being once revealed, no strictness in the phrasing of the writings and no ingenuity in devising a scheme or plan by which the grantor's right of redemption may be lost or forfeited without foreclosure will be of effect. The conveyance in such case will be held to be a mortgage, and that which is in legal or equitable effect a mortgage in its origin will remain a mortgage to the end, so far, at least, as it can be affected by any prior or contemporaneous agreement or understanding of the parties.

It is a further well-established rule that, where a conveyance absolute upon its face is accompanied by a contract or agreement, by which the grantee undertakes to reconvey

the land to the grantor on specified condi-
**2. SAME.** tions, and the terms of such agreement or the
circumstances under which it was made renders it doubtful

whether a mortgage or conditional sale was intended, the courts will hold it to be a mortgage. *Jones v. Gillett*, 142 Iowa, 513; *Russell v. Southard*, 12 How. (53 U. S.) 139 (13 L. Ed. 927); *Flagg v. Mann*, 2 Sumner, 535, Fed. Cas. No. 4,847; *Niggeler v. Maurin*, 34 Minn. 118 (24 N. W. 369).

The record in the instant case is very voluminous, and a statement or recitation of the testimony with any degree of fullness is impracticable. It is made to appear that in June, 1901, the plaintiff being then in the straitened circumstances as above indicated, C. H. Colby addressed him by letter as follows:

3. SAME: evidence.

Mr. W. J. Fort, Marshalltown, Iowa—Dear Sir: Messrs. Patch and Craven have a mortgage on a large tract of land belonging to you, and I understand that the first mortgage has been foreclosed, and that the time of redemption will soon be up, and, as it will take about $150,000.00 to swing this deal, did not know but you would rather take a small amount of cash, and have something, than to lose the whole tract, and get nothing. You can see for yourself that this amount of money is almost impossible to raise at one time. If you should care to figure on selling the whole tract, we would be pleased to hear from you, stating about what you think you will do and the least amount you would be willing to take and deed the land over. Yours truly, C. H. Colby.

The Colbys were at this time in business as bankers at Hartley, Iowa. It does not appear that this letter was answered, and within a short time C. H. Colby went to Marshalltown, and called on plaintiff. Soon thereafter he repeated the call. At both interviews the question of these lands, of plaintiff's necessities, and of the amount of money he desired to raise was discussed; but the testimony with reference to what was said is the subject of radical dispute. Colby concedes that plaintiff did not then wish to sell the land, but was anxious to obtain a loan for a sufficient amount to meet the demands against him, which he estimated at from $155,000 to $158,000. It is the contention of Colby

that he did not offer or promise to make the loan; but plaintiff swears that Colby assured him that between himself and his mother the necessary funds were available, if the terms and security were satisfactory. At the second interview plaintiff says that Colby first suggested that, if the loan was made, it must be secured by deed to Mary E. Colby, and gave as a reason therefor that it was a large loan, that they had experienced trouble with tax ferrets over their loans, and wanted to fix this in a manner to avoid such interference. He further said, according to the witness, that the matter of interest could be provided for in the form of rentals, and when the debt was paid the land would be reconveyed. Neither party claims that any final or positive agreement was reached at these meetings. On June 26, 1901 (whether before or after the second personal interview is not certain), C. H. Colby wrote plaintiff as follows:

Mr. W. J. Fort, Marshalltown, Iowa—Dear Sir: When I was at your city you spoke so you would like to get some one to carry your old, and give you a chance to make all there was in the land, and will say that I have talked the matter over with my mother, and believe she would carry it, if you would make it so she could get 7 per cent. on her investment. I think now we would arrange it so the most of the land would be clear and free from all liens, if we can make a deal with another party that I would like to make. If you would think favorable to any such deal, please let me know the best you would do on a deal of this kind, and oblige. If we make this deal, would want a deed, and have all crops go to pay the interest, and, as fast as you cared to sell the land, to be applied on the amount we would be holding, and we would want statements that we would deed any tract of land when you pay us an agreed price for each tract of so much per acre. This we would have to have a good attorney write, and if you didn't want to keep the land, or wanted us to take it at any time, we would be obliged to at the amount there was coming to us; that is, if you could not keep up the interest, or say, if you ever got so far behind with interest, the land would be ours without foreclosure. We could make a very liberal offer on

this point, provided, by law, we can get something that will suit you and us.  Yours truly, C. H. Colby.

If you will let me know the best you can do, I can then tell if we can swing the same.

Answering, the plaintiff wrote under date of July 1, 1901, as follows:

Marshalltown, Ia., July 1, 1901.
C. H. Colby & Co., Hartley, Iowa—My Dear Mr. Colby: I have your recent letter and the remembrance to your friendly visit not many days ago.  I would be glad if you would aid me in the matter of which you write and was the subject of your recent visit.  You will have precisely the same security to leave the title where it is.  Besides, I could, without fuss, immediately give title to all sales.  I would not object to whatever bonus we might agree upon; but you can see that a rate on any loan expected to go with sale above 5 per cent. would be fatal to sale.  Being single and alone, it is easy for me to execute any papers in 1st Mtg. loans, etc., and you pay, which I should hope you would make reasonable—and I know you would—could come, as I suggested, in way of bonus or commission.  I do not think I ought to come to Hartley in any event now, as I do not want to 'stir up' things.  I thank you for your favors.  Yours truly, Wm. J. Fort.

On July 2, 1901, C. H. Colby wrote the plaintiff in answer to the above as follows:

July 2, 1901.
Wm. J. Fort, Marshalltown, Iowa—Dear Sir: Your favor of the 1st at hand, and contents carefully noted, and will say that, when I made you my proposition a few days ago at the 7 per cent. rate, we were to take the claims, and carry them, and it was not the understanding that we were to put 7 per cent. loans on any of the farms, but, in other words, the money that we could not raise we were to put five per cent. loans on the farms, but at the option of paying any interest pay day, so it would not interfere in the least in selling the farm; in other words, under this proposition, if there is $33.00 incumbrance against the land, we are to receive $2.31 per acre per year for carrying this deal, and we have nothing to do with the

profits that you will make off the land, as those will all go to you. I was talking with my attorney, E. C. Herrick, of Cherokee, Iowa, and he met me at Primghar about this and other matters, and he said the best and most satisfactory way to make a deal of this kind would be for us to take a warranty deed, and buy each and every farm, and for us to give you a written agreement that will give you the exclusive right to sell each and every farm at an agreed price, and, in case you care to buy all the land, the price to be cut to $33.00 per acre, or $31.00 if you cut the incumbrance down some from the rents of the farm this year, and us to charge rent of about 6 per cent. interest or about $2.00 per acre, and in the final wind-up. each of us to have one-half of all the profits and in this deal. We are to place 5 per cent. mortgages on the farms for what money we cannot conveniently raise. Mr. Herrick said it would take him several days to get this agreement written, as it would be very particular to have it so it would give you all the privileges, and still fix it so we would not have to foreclose in case we would not rent the farms for enough to keep up the interest. I have been thinking of going away next Monday morning for a four weeks' trip; but, if we could make the latter deal, I would stay and investigate the securities at once, or could wait until I got back, as you think best. The one thing in waiting money matters might go up; but at present money is still very easy. Yours truly, C. H. Colby.

Following up this correspondence, plaintiff responded with the following letter:

Marshalltown, Iowa, July 4, 1901.

C. H. Colby & Co., Investment Bankers, Hartley, Iowa— Dear Sir: I have your recent letter. This proposition would take years, it would seem, to close up, and from a lawyer's standpoint.is safe. But bankers and other business men do not do all their transactions according to rules laid down by Attys., and their affairs are conducted as safe as though they did. I was attracted to you because you came so far to see me, and I am yet. But I lean to the proposition to let the title remain where it is, and me account to you in commissions for pay for your favors. You will understand that people seeking to buy would not look up the party who recently had the title, but

the one who did then have it. This property is all right to keep every foot of it, and I would like that aid, or at least until I can let go of some of it. Please be careful of your confidences in this regard. With my best wishes for a pleasant trip, I am, Yours truly, Wm. J. Fort.

With the following letter from C. H. Colby, the negotiations were interrupted for a time until his return from a trip to the West:

July 6, 1901.

Mr. Wm. J. Fort, Marshalltown, Iowa—Dear Sir: Your favor of July 4th at hand and contents carefully noted, and will say that you can readily see that in a deal that will necessitate an investment of $185,000.00 we would want to have it fixed by our attorney so that we would know that everything would be correct. We would also want it fixed so that everything would be satisfactory to you, and am certain that this could be done. We would be obliged to take a deed for the reason that we will make the investment so as to get out of paying taxes, as we do not care to pay on moneys and credits, and virtually own the land. If you think that we can make some kind of a deal, and will write me about three weeks from now, I will come down and have another talk with you as soon as I get home from the West. Yours truly.

In August following, after some effort to arrange a place of meeting, C. H. Colby wrote plaintiff, saying that, if any arrangement could be arrived at, it would be upon the basis of "the proposition we talked so much about, as I do not see any other way we could deal and be protected by law." Later plaintiff, in response to the request of Colby, went to Hartley, and accompanied him to the office of Colby's attorney, Mr. Herrick, who prepared a written contract, which was signed by the parties, under date of October 2, 1901. It is in form a contract by which plaintiff, as party of the first part, undertakes to convey the lands in question to Mary E. Colby for the expressed consideration of $155,062; the lands in Dickinson county being reckoned at $30 per acre, and all the rest at $37.50 per acre, said purchase price to be paid as follows:

"By the payment of all the liens and incumbrances on said lands so as to make the title to the same clear in said first party, provided said liens, and incumbrances, and all payment necessary to be made in order to so perfect and clear said titles shall not exceed the said purchase price so agreed to be paid for said lands, and provided, further, that said second party shall have the right to pay the said liens and incumbrances at such times as she may choose or agree with the holders of the same." It was further agreed that, if the sum of the incumbrance and liens proved to be less than the expressed purchase price, the surplus or remainder should be paid to plaintiff. Conveyance was to be made by warranty deed. There is very little in the record to show what was done by the parties between October 2, 1901, and December 3d following. On the latter date plaintiff again accompanied Colby to the office of Mr. Herrick, where he executed the deeds involved in this litigation. At the same time, and evidently part of the same transaction, C. H. Colby, as agent for Mary E. Colby, executed to plaintiff a writing in the form of a lease. It is an instrument of very considerable length, and manifests much care in its preparation. It first provides for the lease of all the lands to plaintiff for a term of five years, he to pay a rental therefor of $2.25 per acre per annum and all taxes and assessments of every kind levied on said lands during the period of the lease. The lessee is given authority to sublet the land on condition that the leases so made be taken in the name of Mary E. Colby, and deposited with her as collateral security for the payment of the rent accruing under the principal lease. Following the foregoing stipulations are additional paragraphs having material bearing upon the principal question at issue in this case. These paragraphs are numbered, and read as follows:

(19) And in further consideration of the said covenants and agreements on the part of the second party, the first party hereby grants unto the second party an exclusive option to

purchase the said above-described lands, or any of them, upon the following terms and conditions, to wit: (Here follows a detailed list of all the leased lands, with schedule of prices thereto attached; such prices varying from $37.50 per acre to $80 per acre.)

(20) Said second party shall have the right to buy not to exceed 20 per cent. of said total acreage any one year, except that, in the event of his not taking advantage of said option for any one of the five years for which said option is granted, then he shall have the right to buy an amount not exceeding the rate of 20 per cent. a year up to the time of so taking advantage of said option; second party having the right to buy said land yearly in 20 per cent. installments as to amount, or all of it at the end of five years, from said October 1, 1901, or 40 per cent. of it at the end of the second year, or 60 per cent. of it at the end of the third year, or 80 per cent. of it at the end of the fourth year, as he may elect. And in case said second party shall not have bought the full 20 per cent. in any one year, he shall have the right to take up the deficiency in any following year he may desire.

(21) But, in order to exercise said option, said second party shall give the first party sixty days' written notice prior to the date any annual interest on any of the first mortgages on any of said land he so desires to buy under this option shall fall due, to enable said first party to take up said mortgages on such land, and as to any of the lands on which there may be a mortgage at the time of exercising said option by the second party, such option can be exercised only by such notice and on such dates. If said option is to buy any of said lands not under mortgage, then the same may be exercised by giving first party thirty days' written notice of the election to so take advantage of such option.

(22) In taking such option, said second party shall in such written notices give a description of the lands which he so elects to take under said option, and, in order to make the full quota that he shall be entitled to at any time, he shall not select lands in such manner as to injuriously affect the values of those remaining by cutting into whole tracts, or dividing the same.

(23) Whenever said second party shall avail himself of said option, and shall have given the written notice provided for, then he shall on or before the date for the execution of

the deed from the first party pay to the first party at Moneta, Iowa, at the bank of C. H. Colby & Co., five-twentieths of said purchase price of the land he so elects to take under said option in cash, and shall execute to said first party his negotiable promissory note for eight-twentieths of the said purchase price, secured back by a first mortgage on said lands, and which said note shall be payable in five years from its date, with annual interest at the rate of 5 per cent. per annum, unpaid interest to draw eight per cent., and with the privilege of paying one hundred dollars or any multiple thereof on any annual interest pay day, and the balance of said purchase price, to wit: Seven twentieths of the whole amount shall be paid by a second note for the same, due on or before five years from its date, with annual interest at six per cent., and unpaid interest to draw interest after due at eight per cent. and the same to be secured by a second mortgage back on said lands so purchased, subject to said first mortgage. Said notes and mortgages to be in the usual forms and containing the customary attorney fee clauses. Said notes to be paid at the bank of C. H. Colby at Moneta, Iowa.

(24) And upon payment of said cash and the execution of said notes and mortgages as above to the first party, said first party agrees to execute to the second party, or to such third party as he shall in writing direct, a special warranty deed of the said premises so purchased under this option, warranting title only against any acts on the part of the said first party. All expenses of conveyancing, including revenue stamps, are to be also paid by the second party.

(25) In order to facilitate the right of the second party to exercise said option, he shall have the right to sell any portion of the lands he shall elect to take under said option, not, however, exceeding the amount he shall so have the right to take under said option, and the first party will, on the written direction of the second party, execute the deed of said lands to such purchaser instead of to the second party, provided that all the terms of said option are fully complied with by such third party so purchasing from the second party. And provided, further, that the entire amount for which the second party shall so sell said lands to such third party shall be paid to the first party, and any notes and mortgages taken for any part of the said purchase price shall be payable to the first party, and conform to the same requirements as to form and

place of payment as the notes from the second party on such purchase, and such amount so paid by such third party and such notes given by him shall stand as a credit to the second party upon this option as follows: First, to the liquidation of the portion of the purchase price due from second party to first party hereunder for said lands as shall at said time remain unpaid; and, second, whatever balance there may be over and above said purchase price for said lands unpaid after the payment the same shall stand as a credit to the second party upon the next succeeding purchase which he may elect to make under this option, and so on until the entire amount of the purchase price provided for herein shall have been fully paid.

(26) And whenever, under this contract, said second party shall have purchased all or enough of said lands to pay to the first party all of the sum of one hundred and fifty-five thousand ($155,000) dollars, together with all rents for said lands, and all taxes thereon, and all advancements for repairs or improvements made by the first party under this contract as hereinafter provided for, and interest on all past due and unpaid rentals, and on such advancements, then the first party will execute a deed like that heretofore called for, for all the entire balance of said lands undisposed of either to the second party or to any third party, and from and after such conveyance all rights to rents therefrom shall at once cease. It is also understood that all rents shall cease on any of the lands taken by the second party under this option prior to the expiration of said period of five years from and after the execution of such deed or deeds by the first party, except that all rents accrued up to the date of such conveyance shall inure to the benefit of the first party.

(27) And it is distinctly understood and agreed that this option is granted upon the express terms and conditions set out above, all of which are conditions precedent to the right to exercise such option, and, if said second party shall fail to keep all taxes fully paid, and shall allow them to become delinquent for the space of 180 days, or if he shall fail to pay all rents as provided for in the foregoing contract for the space of 30 days after the same are due and payable, or shall sublet any portion of said premises without the consent called for herein, or shall fail to turn over to the first party the rentals from any such subletting, or if he shall fail to cultivate said lands in a good, husbandlike manner, or to keep and carry out

any of the covenants by him to be kept and performed, then and in every such case the option hereby granted to purchase said lands, as well as said lease of said lands, or, if any portion of said option shall have been exercised by the second party, then the remaining option to purchase said lands or any of them, shall utterly cease and become and be absolutely void and of no further force or effect, and all payments theretofore made by the second party to the first party shall become forfeited to the first party absolutely. And from thence said first party shall hold said lands or the remainder of them entirely free from this option or lease and from all the terms of this contract. Provided, however, that before any such forfeiture shall occur, or be enforceable, the said first party shall give to the second party written notice of her intention to declare such forfeiture, and no such forfeiture shall become in force until after the expiration of 30 days from the mailing to the post office address of the second party, at Marshalltown, Iowa, a registered letter containing such declaration of forfeiture. And upon such forfeiture having occurred after such notice, then the second party agrees to deliver up to the first party all the lands then held by him as such tenant of the first party in as good condition as required under said lease.

(28) It is further understood that, in case the second party shall not secure a renter for any portion of said lands by January 1st of each year then the first party shall have the right to rent the same herself or by her agent to such party as she may see fit and on such terms as she may see fit.

In witness whereof said parties have hereunto set their hands on the date first above written. Mary E. Colby, by C. H. Colby, Her Duly Authorized Agent. Wm. J. Fort.

There is in the record considerable correspondence between the parties after the date of the deeds and lease, though it is probably not full or complete on either side. For the Colbys it was carried on exclusively by C. H. Colby. Usually in his letters he is careful to speak of the property as the "lands we bought from you," or words to that effect; but there is in them nevertheless much tending to bear out plaintiff's theory of the nature of the understanding between them concerning the conveyances of December 3, 1901. For ex-

ample, on April 10, 1902, speaking to plaintiff concerning a portion of plaintiff's indebtedness which the Colbys had undertaken to pay, he says: "Do you think you will let the Beaman farm go, if we could get the cash price as stated in the lease from us to you? We have a letter this day from Mr. Thompson, stating that there is due up to the present time on the indebtedness of yours $2,000.00 with 7% since March 30, 1901; also interest due this year $2,670.00, and interest since March 30, 1902; also other indebtedness of $44,500.00, and interest since March 30, 1902, at 6%, so, after we send him one more draft, the remaining notes will be at a 6% basis. I expect that we might have to take up this indebtedness in full in order to close your Wright county deal." Again, on May 21, 1902: "There is a party here would like to buy 160 acres of land without improvements, and, if you could fix him off a good quarter of land on the ranch, he would be willing to pay $40 an acre." Again, he tells plaintiff that a party has proposed to exchange certain property for a part of the land, and adds: "We did not give him any encouragement about any trade, and did not know but you might wish to work up an exchange of properties, and put in a section of the Dickinson county land at say about $40 an acre. In this way you might nearly clear the property, if you worked it right."

On the 28th of July, 1903, after having served notice of forfeiture of the original lease, Colby executed to plaintiff another lease of said lands on substantially the terms expressed in the one of December 3, 1901, for the terms of five years from October 1, 1902, except there is added to the agreed rental of $2.25 per acre a gross sum of $17,025, which we suppose represents an unpaid balance of rent accrued under the first lease. The new lease repeats the provisions contained in the several paragraphs which we have quoted at large from the lease first made. At the time of executing this last-mentioned instrument plaintiff signed an indorsement upon the original lease canceling the same. In November,

1903, Colby reported to plaintiff a possible opportunity to exchange the Dickinson county property on a basis of $100,000, receiving in part consideration certain Nebraska property, and later wrote him upon the same subject as follows:

I have been thinking of the Nebraska trade, and believe I understand it correctly. If so, you can make the deal under the $50,000.00 basis. Our understanding is that there is $10,-000.00 against this, which would leave an equity of $40,000.00, and putting in your land at $100,000.00 would leave $60,000.00 coming to us, which would leave the property with simply the $10,000.00 incumbrance or your Nebraska property, provided these folks pay us cash down to where the second mortgage should go. If not, we would have to take a second mortgage back on the Nebraska property as collateral to the Dickinson county land, as you see there would be as much against the Dickinson county land as we really call it worth, and, if the party swung the deal, and paid off, then of course we would release the Nebraska property without consideration, as the Nebraska property would only be collateral mortgage to help secure the Dickinson county land. We believe, if you can get interest and everything to start at the present time, this will be a good deal for you to make; but if I were you I would write as I stated when there, and tell them to try to look over the property, and see what would be the best offer they would make, and it might be they would make a better proposition than this, and, if they did not, I think if I were you I would accept their offer.

On November 12th of the same year concerning a proposed exchange of lands by plaintiff for Minneapolis property Colby writes criticising the wisdom of the transaction, but adds: "Of course it is nothing to us just so we get our cash out of the deal." Other letters covering the period from the date of the second lease, July 28, 1903, and April 15, 1904, contain more or less of similar import.

On the date last named Colby served upon plaintiff a notice of forfeiture as follows:

To William J. Fort: You are hereby notified that the un-

dersigned, Mary E. Colby, will at the expiration of thirty days from the date of service of this notice upon you declare that a certain contract made by and between yourself and said Mary E. Colby on the twenty-eighth day of July, 1903, for the leasing to you of the lands described in said contract, and granting to you an option to purchase said lands upon the terms stated in said contract, forfeited and no longer in force or of any effect whatever for and on account of your failure to comply with the terms there to be performed by you, and for and on account of your failure to make the payments of rent as therein provided for. You will therefore govern yourself accordingly. Dated at Moneta, Iowa, this the 15th day of April, 1904. Mary E. Colby.

· Thereupon a meeting was had between plaintiff and C. H. Colby, at which plaintiff signed an indorsement upon the lease of July 28, 1903, as follows: "Not being able to complete the contract set out on the opposite page here, I hereby agree to its complete and full cancellation in consideration of being released from its terms on my part, and from this date said contract shall be and is absolutely null and void, and the title to said lands absolutely confirmed in the said Mary E. Colby free from any claim on my part under this contract or otherwise. Dated this 16th day of May, 1904. Wm. J. Fort."

Concerning the circumstances of this transaction, there is some dispute. Plaintiff says in substance that Colby represented or claimed that plaintiff's rights in the land and under the lease had been lost, and that, believing such to be the case, and being unable then to do more, he signed the release. At the same time Colby, in the name of his mother, made and delivered to plaintiff a writing authorizing him as agent to sell the land at scheduled prices and on certain terms of payment, he to receive as commissions whatever might be realized from such sales over and above the prices named. These scheduled prices aggregate about $227,000. The instrument is signed by both Colby and plaintiff. The agency is not made exclusive, and is limited to one year.

For the defense C. H. Colby as a witness denies ever

considering the matter of making the plaintiff a loan; says that he at all times insisted upon an absolute purchase and conveyance of the property, and that there was no understanding or agreement whatever that the deeds were to be made or held as security. Defendants rely not alone upon the testimony of C. H. Colby but upon the subsequent surrender and cancellation of the first lease, and upon the later forfeiture and cancellation of the second lease, the acceptance by plaintiff of the contract of agency, and upon the course of business dealings between the parties as disproving the theory that a loan was made or that payment thereof was secured by the deeds in question, and they also assign the same matters and plaintiff's laches as grounds for pleading an estoppel against the assertion of such claims on his part.

Concerning the nature of the transaction culminating in the conveyances and contracts made in October 2 and December 3, 1901, we think the evidence quite conclusively establishes the truth of plaintiff's claim that it was in substance and effect a loan or advancement of money for the use of plaintiff, repayment of which was secured by a conveyance of the lands; that plaintiff was asking a loan, and that he then believed and understood the effect of the deed to be an actual loan of the money to relieve his necessities, and the conveyance to be in the nature of mortgage security for its repayment there is scarcely room for doubt; that such was also the understanding of C. H. Colby, and the basis upon which the negotiations were opened and carried on is but little less certain.

On no other theory is there any reasonable explanation of the language in his letter of June 26, 1901:

When I was at your city you spoke so you would like to get some one to carry your old, and give you a chance to make all there was in the land, and will say that I have talked the matter over with mother, and believe she would carry it, if you would make it so she could get 7 per cent. on her investment. . . . If we make this deal, would want a deed, and

have all crops go to pay the interest, and as fast as you cared to sell this land to be applied on the amount we would be holding. . . . If you could not keep up the interest, or say, if you ever got so far behind with interest, the land would be ours without foreclosure.

So, also, of his language in his letter of July 2, 1901:

Your favor of the 1st at hand and contents carefully noted, and will say that, when I made you my proposition a few days ago at the 7 per cent. rate, we were to take the claims and carry them. . . . Under this proposition, if there is $33.00 incumbrance against the land, we are to receive $2.31 per acre per year for carrying the deal, and we have nothing to do with the profits that you will make off the land, as these will go to you. I was talking with my attorney, E. C. Herrick, of Cherokee, about this and other matters, and he said the best and most satisfactory way to make a deal of this kind would be for us to take a warranty deed, and buy each and every farm, and for us to give you a written agreement that will give you the exclusive right to sell each and every farm at an agreed price, . . . and us to charge rent of about 6 per cent. interest, or about $2.00 per acre. . . . Mr. Herrick said it would take him several days to get this agreement written, as it would be very particular to have it so it would give you all the privileges, and still fix it so we would not have to foreclose in case we would not rent the farms for enough to keep up the interest.

Scarcely less significant is his letter of July 6, 1901, when responding to the plaintiff's suggestion that the title "remain where it is," and permit him to account in commissions for favors extended, and that he desired aid until he could let go of some of the land. Had Colby understood that the transaction was simply one of purchase and sale, the natural thing at this juncture would have been to say so explicitly; but, after saying that in a deal of that magnitude he wants it fixed by his attorney so that "everything would be correct," he adds: "We would also want it fixed so that everything would be satisfactory to you, and am certain that this could be done.

We would be obliged to take a deed, for the reason that we will make the investment so as to get out of paying taxes, as we do not care to pay on moneys and credits, and virtually own the land.''

If he was negotiating for a mere purchase of the land, why enter upon any argument or explanation for requiring a deed from the seller? That the negotiations when resumed at a later date were taken up at the point where they had been suspended and carried on without a material change of intention or purpose is shown by Colby's letter written in August, 1901, in which he says in effect that he is willing to proceed in the matter on the basis of ''the proposition we talked so much about.'' Again, if an absolute purchase and sale were in contemplation, then, aside from an investigation of the question of title, it is difficult to understand the extraordinary solicitude of Colby to submit each step to counsel in order, as he says, ''to be protected.'' If he never contemplated making a loan, and did not regard the land as security only, why should he assure the plaintiff that he would employ a good attorney to write the contract, ''and, *if you didn't want to keep the land, or wanted us to take it at any time,* we would be obliged to at the amount there was coming to us; that is, if you could not *keep up the interest,* or say, if you ever got so far behind *with the interest,* the land would be ours without foreclosure''? How was plaintiff to ''keep the land'' after he had made an absolute conveyance of it? What is meant by his possible failure to ''keep up the interest'' or ''getting behind with the interest'' upon a debt which did not exist, and thereby risking the loss of land in which he had no shred of title? That Colby believed the plan which he proposed would be effectual to eliminate all claims of plaintiff to the land in case of his failure to ''keep up the interest,'' and that in such case a mere notice of forfeiture would make the deeds efficient ''without foreclosure,'' is doubtless true. But the fact that he so understood the legal effect of the transaction, or even that plaintiff also so understood, would not affect

their equities in this proceeding, if, as a matter of fact, there
was a loan to the plaintiff for the security of which the con-
veyance was made. That fact being shown, no amount of
skill in drafting the agreement can serve to cut off the right
of redemption. In this connection reference may be made to
a statement of Colby's claim made for the plaintiff as late as
the year 1904 as follows:

| | |
|---|---:|
| Rent due Oct. 1, 1903.......................... | $ 17,025.00 |
| Interest on same to April 15, 1904............... | 553.15 |
| Interest to April 15, 1904 on $155,000.00........ | 5,037.50 |
| Taxes ...................................... | 1,313.68 |
| | |
| Total .................................... | $ 23,929.33 |
| Received rent .............................. | 4,332.16 |
| | |
| Balance due April 15, 1904................. | $ 19,607.17 |
| Original price ............................. | 155,000.00 |
| | |
| Total due .............................. | $174,607.17 |

If he then believed that no loan had been made, and that
the $155,000 had been paid as purchase money for the land,
why is interest thereon included in the account of plain-
tiff's indebtedness? Testifying as a witness, he is wholly un-
able to explain this item, saying he does not know what it does
mean, and that it is not in fact interest. The statement
does not bear date; but it will be noticed that the items are
computed up to April 15, 1904, the time when the final notice
of forfeiture was given to plaintiff, and is very clearly a
summary of what Colby then claimed the situation to be.
Beginning with October, 1903, the close of the preceding two
years under the lease, he charges up the accumulated "rents"
with interest thereon and taxes paid, and to this he adds in
express terms "interest on $155,000, $5,037.50"; then the
sum of these items is increased by the "original price" $155,-

000, making a "total due" of $174,607. If this memorandum is capable of any other explanation than we have suggested, it has not been disclosed. Mr. Colby, as we have seen, testifies that he does not know what was meant by the interest item. He does not deny that he prepared it, but seizes upon the fact that it is not signed by him as a sufficient circumstance for passing it as a thing or incident of no moment.

The books are not without precedents bearing upon the question when a deed absolute in form is to be treated as a mortgage. The rules of law in this respect are not the subject of any serious disagreement. Reading the precedents, it is quite noticeable that among the most frequent devices employed to conceal the real character of a deed given as a mortgage is the plan by which, instead of giving to the grantor an unequivocal defeasance, the grantee gives him a contract to reconvey the land on certain specified conditions. Such an agreement may, of course, be entirely valid and enforceable; but it has been held in a multitude of cases that the courts will scrutinize such contracts closely, and, if found to be but a method employed to secure the payment of a debt, the transaction will be treated as a mortgage, and, as we have already noted, if, as between a mortgage and a conditional sale, the testimony leaves the question in doubt, the court will hold it a mortgage. *Trucks v. Lindsey,* 18 Iowa, 504; *Jones v. Gillett,* 142 Iowa, 513; *Green v. Turner,* 38 Iowa, 114.

4. Same: redemption.

In *Conlee v. Heying,* 94 Iowa, 734, there was as in this case a deed absolute in form, with a lease in return, with a provision giving the lessee a right to repurchase the land in one year. Later another lease was made, with right to the lessee to repurchase before a certain date at which the option should expire. The testimony showing that the transaction was in fact a loan and the deed to have been given as a mortgage was much less persuasive than we find in the present record, and a decree permitting redemption was affirmed. The case of *Keeline v. Clark,* 132 Iowa, 360, has many points in common

with this. There an absolute conveyance was given, with separate agreement giving the grantor the right to repurchase. The grantee swore positively that he refused to make a loan, and consented to enter the deal only on the basis of an absolute and unconditional sale, and in this he was corroborated. Later the agreement to reconvey was given up, and another taken. Possession was surrendered, and thereafter another deed was made to the grantee. The trial court having sustained the deeds as absolute and valid conveyances, this court reversed the decree, holding that, notwithstanding these multiplied conveyances and relinquishments, the circumstances showed the transaction to be one of mortgage and not of sale.

Many more cases could be quoted directly to the point upon the real nature of the transaction; but the limits of this discussion already too greatly extended will not permit. But, as fully sustaining the view we have above expressed, see *Russell v. Southard*, 12 How. (53 U. S.) 139 (13 L. Ed. 927); *Haggerty v. Brower*, 105 Iowa, 395; *Morris v. Nixon*, 1 How. (42 U. S.) 118 (11 L. Ed. 69); *Schierl v. Newburg*, 102 Wis. 552 (78 N. W. 761); *Carveth v. Winegar*, 133 Mich. 34 (94 N. W. 381); *Malone v. Danforth*, 137 Mich. 227 (100 N. W. 445); *Wells v. Geyer*, 12 N. D. 316 (96 N. W. 289); *Rempt v. Geyer* (N. J. Ch.) 32 Atl. 266; *Thompson v. Investment Co.*, 114 Iowa, 481; *Richardson v. Barrick*, 16 Iowa, 407; *Bayley v. Bailey*, 5 Gray (71 Mass.) 505; *Grand United Order of Odd Fellows v. Merklin*, 65 Md. 579 (5 Atl. 544); *Batty v. Snook*, 5 Mich. 231; *Kintner v. Blair*, 8 N. J. Eq. 485; *Hickox v. Lowe*, 10 Cal. 197; *Woodward v. Pickett*, 8 Gray (74 Mass.) 617; *Jackson v. Lynch*, 129 Ill. 72 (21 N. E. 580, 22 N. E. 246).

The principle governing the courts in dealing with these cases is aptly stated by Mr. Pomeroy as follows: "A court of equity will look beyond the external form at the real relations between the parties, and will protect the debtor's equity of redemption, if necessary, in opposition to the literal terms of the instrument. This principle lies at the base of the entire equitable doctrine, and is applied to mortgages in the ordinary

form, to deeds with separate defeasances, to deeds absolute on their face, to deeds with accompanying agreements to reconvey, and to every other form of assurance which is in reality a security.''   3 Pomeroy's Eq. 3d Ed. note seq. 1192.

Again, the same author says   (section 1193):   ''If the instrument is in its essence a mortgage, the parties cannot by any stipulation, however express or positive, render it anything but a mortgage, or deprive it of the essential attributes belonging to a mortgage in equity.   The debtor or mortgagor cannot in the inception of the instrument, as a part of or collateral to its execution, in any manner deprive himself of his equitable right to come in after default in paying the money at the stipulated time, and to pay the debt and interest, and thereby to redeem the land from the lien and incumbrance of the mortgage; the equitable right of redemption, after default is preserved, remains in full force, and will be protected and enforced by a court of equity, no matter what stipulations the parties may have made in the original transaction purporting to cut off this right.''

5. SAME.

Other circumstances than have yet been mentioned are not wanting which tend strongly to the conclusion that the transaction was in fact one of loan and security.   Among them is the fact that appellants undertook to advance or pay only so much money as was believed to be required to remove the liens from the lands.   If appellant's theory is correct, plaintiff was conveying away all this large property without the assurance of a dollar's return therefor to himself.   Appellants were not undertaking to pay all his debts regardless of whether they were liens on the land.   Indeed, it appears that at the same time when this deal was being pressed to meet certain other claims which were not liens the Colbys lent him on personal security or collateral something more than $8,000, which amount was no part of the $155,000, and was paid off by him during the next two or three years.   It further appears that on final computation of the

6. SAME.

moneys expended and debts assumed by the appellants there was remaining an unexpended balance of the $155,000, amounting to several hundred dollars, and this was applied by the appellants upon their claim for "rent." That plaintiff was thus parting with all his property, and depriving himself of all further possibility of saving even a fragment from the wreck of his fortunes simply to relieve from its burden of liens the land which he was deeding away, instead of letting the foreclosure proceedings have their course, is quite incredible. The unreasonableness of such transactions has often been given weight in support of the claim that a conveyance was intended for a mortgage. For example, in *Trucks v. Lindsey,* 18 Iowa, 504, speaking of a similar situation, this court said: "And, again, the amount of money received by the plaintiff was just equal to the incumbrance upon the property, and therefore no probable advantage would be gained by a sale to defendant for that sum, thus showing the absence for any motive for the act." So, also, in *Haggerty v. Brower,* 105 Iowa, 395, where a like circumstance appeared, we said: "Inasmuch as plaintiff was getting nothing for himself out of the land in a sale to the defendant, it seems somewhat strange that he should be solicitous for that method of paying his debts rather than through foreclosure proceedings."

X. It is also a well-established rule that, while mere inadequacy of consideration is not sufficient to justify the conclusion that a deed absolute in form is intended as a mortgage, such inadequacy being established is a very material fact to be considered with other circumstances tending to support that conclusion. *Russell v. Southard, supra; Davis v. Demming,* 12 W. Va. 246; *Richardson v. Barrick,* 16 Iowa, 407; *Jones on Mortgages,* section 272; *Keeline v. Clark;* 132 Iowa, 360; *Rogers v. Davis,* 91 Iowa, 730.

7. SAME: inadequacy of consideration.

The evidence tends strongly to show that the lands were worth much more than $155,000. At that price the lands

would average about $34.50 an acre. The witnesses as usual in such cases differ widely in their estimates of the market value. Of the lands something more than 1,800 acres were in Marshall county of this state, 640 acres in Wright county, about 1,580 acres in Dickinson county, and the remainder in Illinois. It is a matter of common observation that at the date in question some of the locations were in counties advanced in settlement and improvements, while others were less favorably situated, and there was no doubt very considerable difference in their respective values. Taking all the testimony bearing thereon into consideration, we are inclined to the view that at the date of the conveyances the lands were at a moderate figure fairly worth an aggregate of at least $200,000. Indeed, the parties themselves in their contract of the same date placed a schedule of minimum values on the lands, at which plaintiff was authorized to purchase or sell them, aggregating over $228,000. The fact that plaintiff was willing to undertake the sale of the property at these figures and, if appellants be correct, rely for his profit solely upon what he might realize in excess of such minimum shows at least his estimate of their value, and the theory that he was making an absolute sale for no other consideration than the assumption or discharge of the liens on the land and the privilege of himself purchasing or finding other purchasers who might be willing to pay more than $70,000 in excess of the price paid by appellants would scarcely be consistent with the presumption of his sanity.

Finally upon this feature of the case attention is due to certain terms of the written contract or lease of December 3, 1901. As we have already noted, the amount of money which appellants undertook to advance or pay for the release of the liens was limited to $155,000, and they furnished plaintiff no more than this amount, except the loan of about $8,000, which did not figure in the consideration for the conveyances. In other words, if the real essence of the transaction was a loan, then the principal sum for which the plaintiff

became indebted was $155,000. We have also mentioned the fact that the option given plaintiff to purchase or to sell to others was at a fixed minimum price aggregating about $228,000, yet strangely enough, when we turn to paragraph 29 of the lease, we find a provision that, whenever plaintiff shall have purchased all or enough of said lands to pay to the party of the first part $155,000, together with all rents for said lands, and all taxes, and all advancements for repairs or improvements, with interest on past due rents and advancements, then the party of the first part will convey all remaining lands undisposed of to plaintiff or to any third party as he shall direct, "and from and after such conveyance all rights to rents therefrom shall at once cease." If for the word "rent" or "rents" as employed in this writing we substitute the alternative "interest," as was done by Colby in the negotiations leading up to its execution, one could hardly frame a more explicit recognition of the transaction as one of loan and security and not of sale.

It is to be admitted, as we have before noted, that during the course of these dealings, and in a more marked degree after the forfeiture so called, C. H. Colby often spoke to plaintiff of "the lands we bought of you," and in his mother's name exercised much authority consistent with that claim; but it has often been held that complete surrender by the debtor, the control of the premises by the creditor, the acceptance by the debtor of leases, and the payment of rent, while proper evidence in the case, are not necessarily conclusive of the real character of the transaction, and the deed, though unconditional, may still be a mortgage. In this connection the straitened and helpless condition of the borrower, his ignorance or misconception of his rights, the power which the creditor acquires with the title to the debtor's entire estate are not to be overlooked. Plaintiff was earnestly seeking a loan. He believed, and it seems he was justified in believing, that he had a valuable equity in the property, which could be saved if help could be secured to prevent the sacrifice of the

property at forced sale, and enable him to carry it until it could be disposed of in the normal course of business. The situation, the course and manner of the negotiations, and all its accompanying circumstances convince us that he supposed that he was obtaining a loan, and that Colby could not fail to know that plaintiff so understood it. Such being the case, we cannot do otherwise than hold that the $155,000 was advanced as a loan, though it was doubtless done with the confident expectation on the part of appellants that plaintiff would fail in making repayment as agreed upon, and that under the stringent terms of the contract his rights in the premises would be extinguished, and the lands become theirs "without foreclosure."

We have given attention to the cases of *Cold v. Beh*, 152 Iowa, 368, *Bradford v. Helsell*, 150 Iowa, 732; *Hanford v. Blessing*, 80 Ill. 188, and others of their class which have been cited and relied upon by the appellants, but find nothing in them necessitating any modification of the views herein expressed. As upon every rule of law and equity, there are border line decided cases on either hand which have many · apparent resemblances, yet when carefully considered are easily distinguishable.

In the *Bradford* case it was conclusively shown that the property was charged to the bank at its full value, and the great preponderance of the evidence was to the effect that the deed was made with the express intent and understanding that it witnessed an absolute purchase and sale and not a mere matter of security. The *Cold* case presented the usual disputed question of fact as to the agreement between the parties at the time the conveyance was made, and the court held that the plaintiff's claim in that respect had not been sustained by a sufficient showing of evidence. The opinion in the Illinois case as summed up in the syllabus is that "contracts for repurchase, made contemporaneously with conveyances of real estate, absolute in form, are sometimes strong evidence tending to show the conveyances are intended to be

mortgages; but, where it appears that the parties really intended an absolute sale and a contract allowing the vendor to repurchase such intention must control.'' The rule so stated is in no manner inconsistent with our views as we have here expressed them. That absolute conveyances with contracts by which the grantee agrees to resell and convey to the grantor upon certain conditions are not necessarily mortgages is conceded; but it is no less equally true that such a conveyance and contract when used to witness a transaction which is in essential effect a loan constitute a mortgage, and will be so treated in equity. It is in each case a question of the intent of the parties, and this is ordinarily to be determined more by the peculiar facts and circumstances which attend and give character to the transaction than to the categorical affirmations and denials of the parties on the witness stand.

II. Having found that the deeds were given as a mortgage, the other vital question arises whether plaintiff is to be held to have relinquished or otherwise divested himself of the right to redeem therefrom.

It cannot be disputed that it was competent for plaintiff to abandon his rights in the premises, and by proper instrument or agreement release or convey his equity of redemption. But this rule will not be applied in 8. SAME: release any doubtful case. It is quite the universal of mortgagor's equity. holding that, the character of an instrument as a mortgage being once admitted or established, a relinquishment or surrender to the mortgagee of the mortgagor's equity will be sustained only upon clear and satisfactory showing that the agreement to that fact is perfectly fair and free from any element of advantage or oppression. The voice of the authorities is well expressed by the Supreme Court of the United States in *Alexander v. Rodriguez,* 12 Wall. (79 U. S.) 323 (20 L. Ed. 406), where it is said: ''The law upon the subject of the right to redeem where the mortgagor has conveyed to the mortgagee his equity of redemption is well

settled. It is characterized by a jealous and salutary policy. Principles almost as stern are applied as those which govern where a sale by a *cestui que* trust to his trustee is drawn in question. To give validity to such a sale by a mortgagor, it must be shown that the conduct of the mortgagee was, in all things, fair and frank, and that he paid for the property what it was worth. He must hold out no delusive hopes; he must exercise no undue influence; he must take no advantage of the fears or poverty of the other party. Any indirection or obliquity of conduct is fatal to his title. Every doubt will be resolved against him.'' To the same effect, *Russell v. Southard, supra; Pough v. Davis,* 96 U. S. 332 (24 L. Ed. 775). The rule is also affirmed in *Locke v. Palmer,* 26 Ala. 312; *Niggeler v. Maurin,* 34 Minn. 118 (24 N. W. 369); *Hyndman v. Hyndman,* 19 Vt. 9 (46 Am. Dec. 171).

And where the mortgagee obtains a relinquishment or conveyance of the equity of redemption for no other consideration than the original debt, it is quite generally held that the burden is upon him to show that it was fair, and that the conveyance of the equity was voluntarily and intelligently given, and, as is frequently added, that such transaction ''is entirely unconnected with the original contract of mortgage.'' See note 1 to section 1193, 3 Pomeroy's Equity (3d Ed.); also *Hursey v. Hursey,* 56 W. Va. 148 (49 S. E. 367); *Sadler v. Taylor,* 49 W. Va. 104 (38 S. E. 583); *Lewis v. Wells* (D. C.) 85 Fed. 896; *Bradbury v. Davenport,* 114 Cal. 593 (46 Pac. 1062, 55 Am. St. Rep. 92; *Liskey v. Snyder,* 56 W. Va. 610 (49 S. E. 515); *Remsen v. Hay,* 2 Edw. C. (N. Y.) 535; *Odell v. Montross,* 68 N. Y. 500; *Holridge v. Gillepie,* 2 Johns, Ch. (N. Y.) 30; *Henry v. Davis,* 7 Johns. Ch. 40; *Sheckell v. Hopkins,* 2 Md. Ch. 89; *Wagg v. Herbert,* 19 Okl. 525 (92 Pac. 252); Jones on Mortgages, section 251.

It is also held that it must appear that such relinquishment was made upon adequate consideration. As was said by Field, J.: ''The release must be for an adequate considera-

9. SAME: burden of proof: consideration.

tion; that is to say, it must be for a consideration which would be deemed reasonable if such transaction were between other parties dealing in similar property in the same vicinity. Any marked undervaluation in the price paid will vitiate the proceeding." *Pough v. Davis,* 96 U. S. 332 (24 L. Ed. 775); *Oliver v. Cunningham* (C. C.) 7 Fed, 694; *Clarke v. Fast,* 128 Cal. 426 (61 Pac. 72); *McLeod v. Bullard,* 84 N. C. 515; *Perkins v. Drye,* 3 Dana (33 Ky.) 170; *Moeller v. Moore,* 80 Wis. 434 (50 N. W. 396); *Marshall v. Thompson,* 39 Minn. 142 (39 N. W. 309); *Linnell v. Lyford,* 72 Me. 283; *Lynch v. Ryan,* 132 Wis. 271 (111 N. W. 707, 112 N. W. 427).

Speaking of the effect of additional conveyances or agreements following a conveyance shown to have been given as a mortgage, the Minnesota court uses this language: "Though a mortgagee may purchase the equity of redemption, yet, where the relation is once established, the courts scrutinize with great jealousy the acquisition of the equity of redemption by the mortgagee in any other way than by regular foreclosure. Any additional conveyances exacted or secured by the mortgagee for his benefit cannot be used to prevent a redemption. They proceed from the same old root, and are subject to the same equity; otherwise hardship and oppression might be practiced upon the mortgagor." *Marshall v. Thompson,* 39 Minn. 142 (39 N. W. 309).

On the same point the Illinois court says: "When the mortgagor has conveyed the mortgaged premises to the mortgagee, it only operates as a bar to the equity of redemption, when it clearly and unequivocally appears that both parties so understood and intended it should. Otherwise it will only be regarded as a mere change in the form of the security." *Ennor v. Thompson,* 46 Ill. 222.

Applying these rules, we think there is no escape from the conclusion reached by the trial court that equity will hold, that the plaintiff's equity of redemption has not been effectually cut off, and that he is entitled to make redemption upon equitable terms. The change made by the so-called forfeiture or termination of the

10. SAME.

first lease and the execution of the second introduced no new element into the situation. Except as it provided for payment of accumulated unpaid rents as one of the conditions of the new contract, the two instruments are substantially identical in terms and effect, unless it be contended that the agreement to pay rent is an admission of the title of the appellants, and is emphasized or strengthened by repetition. It is true, of course, as already intimated, that the taking of the lease is a competent evidentiary circumstance bearing upon the question of the real nature of the transaction; but it is by no means conclusive. Indeed, it is not at all an unusual circumstance that a deed given as a mortgage is accompanied or followed by a surrender of possession or by a lease to the grantor. Two purposes are thus served; the security is ordinarily thereby increased, and it serves to aid the disguise by which the real nature of the transaction is concealed. *Keeline v. Clark,* 132 Iowa, 360; *Rogers v. Davis,* 91 Iowa, 730; *Jones v. Gillett,* 142 Iowa, 513; *Haggerty v. Brower,* 105 Iowa, 395; *Clark v. Landon,* 90 Mich. 83 (51 N. W. 357); *Alderson v. Caskey* (Ky.) 24 S. W. 629; *Patrick v. Littell,* 36 Ohio St. 79 (38 Am. Rep. 552).

Nor do we think that the surrender and cancellation of the second lease after notice of forfeiture served upon him can be held to bar the plaintiff's right to redeem. In the first place it was without any consideration, certainly without any adequate consideration. He had an interest in the land over and above the appellants' lien, amounting in value to the equivalent of a comfortable fortune, and, if this relinquishment is held effective, he surrendered or abandoned it without even the shadow of compensation, unless it is to be found in a twelve months' privilege, not exclusive, of selling these same lands at scheduled prices which would net the appellants in round numbers $227,000. In other words, he was to find his compensation in the privilege of earning commissions by the sale of said lands within one year in competition with the appellants themselves and such other agents as they might em-

ploy, at prices which would net appellants a sum of money sufficient to pay not only the original $155,000 and all accumulations and charges thereon (which, as we have seen, appellants at about this time reported to him as showing a total "amount due" of $174,607.17), but the still further sum of not less than $52,000. The possibility that such a privilege could be of any value whatever is, to put it mildly, not so self-evident that in the absence of testimony we can say it afforded any adequate consideration for the surrender of plaintiff's equity of redemption.

Again, the authorities all agree that the court should regard the situation of the respective parties and the helplessness of a distressed debtor who, under the pressure of adverse circumstances, finds himself driven to the wall, and feels himself (sometimes mistakenly perhaps) forced to accept the hard conditions placed upon him by creditors who have in their control his entire estate. The equitable doctrine in this respect is "based upon the relative situation of debtor and creditor; it recognizes the fact that the creditor necessarily has power over his debtor which may be exercised inequitably, that the debtor is liable to yield to the exertion of such power; and it protects the debtor absolutely from the consequences of his inferiority and of his own acts done through infirmity of will." 3 Pomeroy's Equity (3d Ed.), section 1193, note 1.

11. SAME: equitable relief.

Says the Lord Chancellor in *Vernon v. Bethell*, 2 Eden, 113: Necessitous men are not, truly speaking, free men, but to answer any present emergency will submit to any terms the crafty may impose upon them.'' This language is quoted approvingly by Curtis, J., in *Russell v. Southard, supra,* where the grantor, in a deed absolute in form but given as a mortgage, abandoned the land to the creditor, and later surrendered the written contract, and gave him a receipt in full, yet after a period of nineteen years was permitted to assert his right to redeem upon equitable terms.

It may be well that plaintiff, knowing that he had given

a deed absolute in form, and having failed to sell the lands at
the prices to which he had bound himself, and finding the in-
terest or so-called rents accumulating, and being served with
action of forfeiture, believed that his rights in the premises
were hopelessly lost, and he must accept appellants' terms or
nothing. That a person enmeshed in such embarrassments,
and thus misconceiving his rights, will be relieved from the
unconscionable terms of an agreement imposed by his creditor
is a well-established rule of equity. In applying this rule
to a case where the grantor in a deed given as a mortgage
had surrendered possession of the premises, and thereafter
took two successive leases from the grantee, the Court of
Chancery of New Jersey, after finding that the original deed
was a mortgage, says: ''Such being the effect of the writings
and the intention of the parties at the time they were made,
the nature of the transaction was not changed by the subse-
quent leases. It may be that he and perhaps defendants,
also, supposed that when the time for payment expired the
agreement of the defendants to reconvey was no longer of any
effect. He and perhaps they may not have understood that
writings of this nature originally constituting a mortgage re-
main a mortgage, although default be made in payment at the
time fixed.'' *Kintner v. Blair,* 8 N. J. Eq. 485.

We are satisfied that it would be wholly inequitable to
hold that the writings in this case were made under circum-
stances which operate to foreclose the plaintiff's equity in
this case.

III. But it is said that plaintiff should be held estopped
to maintain this action because of his laches and of his con-
duct with reference to the land and his dealings with the
appellants. In our judgment the record is
wholly wanting in the essential elements of
estoppel. Finding, as we do, that the orig-
inal relation of the parties was that of debtor and creditor,
that the conveyances were taken as a mortgage security, and
that the equity of redemption was never relinquished, it

12. SAME: ac-
counting: re-
demption:
estoppel.

necessarily follows that the relation of debtor and creditor, mortgagor and mortgagee, still exists, and that the extent of appellant's right in the premises is to demand and receive every dollar of the debt due them. When that is provided for and accomplished, there is no principle of law or equity which entitles them to ask more, and, if any of the property on which they have held a lien is left unexhausted, a decree for its release to their debtor wrongs no one. It is true that plaintiff waited three years after the attempt of appellants to forfeit his rights in the lands. Meantime the appellants were in the position of mortgagees in possession, their lien was in no manner interfered with, and a delay of three years in asking an accounting and to enforce his right of redemption is not so unreasonable that the court will deny him a hearing. The decree below allows appellants principal and interest of the original debt and compensation for improvements made and taxes paid on the land. It accomplishes substantial justice, and we think it must stand.

IV. We find no merit in plaintiff's appeal from the allowance to appellants of compensation for improvements put upon the land. It is true that ordinarily a mortgagee in possession may not burden the land with 13. SAME: mortgagee in possession: improvements: accounting. the cost of permanent improvements at the expense of the mortgagor. But here the parties by their express contract contemplated that such improvements might be made, and provided that upon a repurchase or redemption by the plaintiff such expenditures or advancements should be paid for. The trial court did not err in this respect.

V. The trial court first announced its holding that plaintiff was entitled to redeem, and then, without formal entry of judgment, gave the defendants considerable time to present the matter of accounting. When this 14. APPEAL: time for taking appeal. was done, a formal decree was entered embodying a full decision of the case. The defendants' appeal was taken more than six months after the

announcement of the court's finding upon the general merits of the case, but within less than six months after the entry of the decree. Plaintiff contends that the appeal brings up nothing but the accounting.

As we find the case may be affirmed on its merits, we do not enter upon any discussion of the question thus raised further than to say that, as we understand the situation, there was no record entry made of the court's original announcement, and, if this be true, we think under precedents too numerous to mention it must be held that the time for appeal dates from the entry of the final decree. The decree below must therefore be affirmed on both appeals. Of the costs in this court the appellee will pay for thirty pages of his own printing. All other costs will be taxed to appellants.—*Affirmed.* All the Justices concur.